CHEMTROL ADHESIVES, INC. *v.* AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY ET AL.; LEXINGTON INSURANCE COMPANY, APPELLANT; MIDLAND-ROSS CORPORATION, ROSS AIR SYSTEMS DIVISION, APPELLEE.

[Cite as Chemtrol Adhesives, Inc. *v.* American Mfrs. Mut. Ins. Co. (1989), 42 Ohio St. 3d 40.]

(No. 87-1979—Submitted January 11, 1989—Decided April 19, 1989.)

*Arter & Hadden, Anthony J. Damelio, Jr.; Denenberg, Tuffley, Bocan, Jameson, Black, Hopkins & Ewald, P.C., William G. Jameson, George F. Curran III* and *Dana L. Ramsay,* for appellant.

*Thompson, Hine & Flory, Daniel W. Hammer, Jeffrey R. Appelbaum* and *Thomas L. McGinnis,* for appellee.

WRIGHT, J. Several issues are presented herein for review. The first is whether the subrogee of a commercial consumer may maintain an action keyed to negligence and strict liability theories for solely economic damages. The second is whether the trial court was correct in entering summary judgment against Lexington in its breach of warranty action against Midland-Ross on the grounds that Midland-Ross did not receive timely and adequate notice of its alleged breach of the contract. Finally, we must determine whether to give effect to the limitation-of-damages provisions contained in the contract at issue. For the reasons set forth below, the judgment of the court of appeals is affirmed in part and reversed in part.

## I

Few matters in the development of products liability law have generated more judicial inquiry and scholarly comment than the ever-uncertain boundary between tort and contract. On the one hand, our system is guided by the equitable policy of tort law that injured consumers should be entitled to recover from those who manufacture and distribute a defective product.[1] On the other hand, fundamental principles

---

[1] "The doctrine of strict products liability in tort was created 'to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' " *Purvis v. Consol. Energy Products Co.* (C.A.4, 1982), 674 F. 2d 217, 219 (quoting *Greenman* v. *Yuba Power Products, Inc.* [1963], 59 Cal. 2d 57, 63, 27 Cal. Rptr. 697, 701, 377 P. 2d 897, 901).

of contract law teach us that parties to a commercial transaction should remain free to govern their own affairs.[2] Here we are faced with a situation where both tort and contract principles are invoked.

Appellant Lexington argues that in seeking indemnification from Midland-Ross it is not limited to an action on the Chemtrol/Midland-Ross contract. In its third-party complaint against Midland-Ross, Lexington asserted tort claims sounding in negligence, breach of express and implied warranties, and strict liability. The trial court held that these counts of the third-party complaint "must fail as the Ohio Uniform Commercial Code governs the rights and liabilities of the parties where the transaction involved was a commercial transaction and the parties were in privity of contract." The court of appeals agreed, concluding as to this issue: "Since the trial court found that the parties were large corporations in privity of contract who negotiated from equal bargaining positions, * * * [Lexington's] rights were limited to the contract provisions and the UCC."

Lexington sued Midland-Ross for "all damages recovered by * * * [Chemtrol] against Lexington * * *." As Chemtrol's insurer and subrogee, Lexington succeeds to all rights and the benefit of all remedies available to Chemtrol. *State* v. *Jones* (1980), 61 Ohio St. 2d 99, 100-101, 15 O.O. 3d 132, 133, 399 N.E. 2d 1215, 1216-1217. However, an insurer-subrogee cannot succeed to or acquire any right or remedy not possessed by its insured. *Aetna Cas. & Sur. Co.* v. *Hensgen* (1970), 22 Ohio St. 2d 83, 91, 51 O.O. 2d 106, 111, 258 N.E. 2d 237, 242-243. Accordingly, since Lexington's remedies are limited to those possessed by Chemtrol, our inquiry must focus on the damages claimed by Chemtrol and whether Chemtrol itself would be able to recover from Midland-Ross for same.

Chemtrol's complaint against Lexington and American alleged "damage to property insured by * * * [Lexington and American] with resultant expenses and business interruption losses continuing until June 30, 1981 * * * ."

Chemtrol itemized its claim of $225,407.43 in damages as follows:

"1. $33,005.00 for additional energy costs.

"2. $18,119.97 for the extra expense incurred by Chemtrol for the purchase of outside silicone coated paper while the line was down and being repaired.

"3. $186,944.30 of solvent which had to be purchased during the time the heat exchangers were down.

"4. $1,710.00 — The difference in valuation of 9500 gallons of solvent inventory.

"5. $15,628.16 — Invoices for initial repair and final replacement for Jacco, Hudson, Ohio as well as some minor amounts for clean-up supplies, labor and items of that nature."

The Chemtrol/Midland-Ross contract contained a one-year limited war-

---

[2] As provided in UCC Section 1-102(C), codified at R.C. 1301.02(C):

"The effect of provisions of * * * [Chapters 1301 to 1309, inclusive] of the Revised Code may be varied by agreement, except as otherwise provided in these chapters and except that the obligations of good faith, diligence, reasonableness, and care prescribed by these chapters may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable."

ranty and a limitation of Midland-Ross' potential liability as follows:

"WARRANTY

"Except as hereinafter in this section set forth, all equipment sold by Seller is warranted for a period of one year from the date of shipment to the Purchaser to be free from latent defects in material and workmanship disclosed under normal use and service. If the Purchaser within this period notifies Seller in writing of any claimed defect in any equipment delivered by Seller and such equipment is found by Seller, after appropriate tests and inspection by Seller, not to be in conformity with this warranty, Seller will at its option and expense either repair the same or provide a replacement therefor, F.O.B. Seller's shipping point. THE WARRANTY STATED HEREIN IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR PARTICULAR USE.

"LIABILITY LIMITATION

"In the event of a breach or repudiation of this contract on any of the provisions by the Seller, Purchaser shall not be entitled to recover incidental or consequential damages including those arising upon breach of IMPLIED WARRANTY OF MERCHANTABILITY or any losses, costs, expenses, liabilities and damages (including, but without limitation to, loss of use or profits, damages to property, all liabilities of the Purchaser to its customers or third persons, and all other special or consequential damages) whether direct or indirect, and whether or not resulting from, or contributed to by the default or negligence of Seller, its agents, employees, or subcontractors, which might be claimed as the result of the use or failure of the equipment delivered. Nor shall the Purchaser be entitled to recover any costs for materials expended or used, initiated at the request of the Buyer or Purchaser. Seller's liability on its warranty shall in no event exceed its cost of correcting the defects in the equipment sold or replacing the same with non-defective equipment." (Capitalization *sic.*)

It is obvious that Chemtrol's right to recover the damages sustained would be significantly limited under the contract. (This issue is discussed in greater detail in Part III, *infra.*) As noted above, Lexington's right to recover from Midland-Ross rises no higher than that of Chemtrol. However, Lexington seeks to go outside the contract and assert claims against Midland-Ross based upon various tort theories.

Generally speaking, a defective product can cause three types of injury: personal injury, property damage, and economic loss. *Mead Corp.* v. *Allendale Mut. Ins. Co.* (N.D. Ohio 1979), 465 F. Supp. 355, 363. "Personal injury" is, of course, self-explanatory. "Property damage" generally connotes either damage to the defective product itself or damage to other property. "Economic loss" is described as either direct or indirect. "Direct" economic loss includes the loss attributable to the decreased value of the product itself. Generally, this type of damages encompasses "the difference between the actual value of the defective product and the value it would have had had it not been defective." *Id.; Cincinnati Gas & Elec. Co.* v. *General Elec. Co.* (S.D. Ohio 1986), 656 F. Supp. 49, 56. It may also be described as "the loss of the benefit of the bargain * * *." *Spring Motors Distributors, Inc.* v. *Ford Motor Co.* (1985), 98 N.J. 555, 566, 489 A. 2d 660, 665; *Mid Continent Aircraft Corp.* v. *Curry Cty. Spraying Service, Inc.* (Tex. 1978), 572 S.W. 2d 308, 312-313.

"Indirect" economic loss includes the consequential losses sustained by the purchaser of the defective product, which may include the value of production time lost and the resulting lost profits. See, generally, Comment, The Vexing Problem of the Purely Economic Loss in Products Liability: An Injury in Search of a Remedy (1972), 4 Seton Hall L. Rev. 145, 154-155; Note, Economic Loss in Products Liability Jurisprudence (1966), 66 Colum. L. Rev. 917, 918 (hereinafter "Note, Economic Loss").

In the instant case, no personal injuries are claimed to have been sustained as a result of the defect in the arch dryer system. Of the damages claimed, Items 1 through 4 above are additional production expenses incurred by Chemtrol, *i.e.,* consequential expenses generally regarded as economic loss. However, Item 5, costs of repair and replacement of the damaged components of the system, presents a more difficult classification problem. The definition of "economic loss" typically includes cost of repair or replacement of the defective product. See, *e.g., Salmon Rivers Sportsman Camps, Inc.* v. *Cessna Aircraft Co.* (1975), 97 Idaho 348, 351, 544 P. 2d 306, 309; *Cincinnati Gas & Elec. Co., supra,* at 56. However, a product's self-inflicted damage is by definition "property damage." Courts have used both characterizations to describe damage to the product itself. See, *e.g., Iacono* v. *Anderson Concrete Corp.* (1975), 42 Ohio St. 2d 88, 93, 71 O.O. 2d 66, 69, 326 N.E. 2d 267, 270 (property damage); *St. Paul Fire & Marine Ins. Co.* v. *Steeple Jac, Inc.* (Minn. App. 1984), 352 N.W. 2d 107, syllabus (economic loss). However, as discussed in Note, Privity Revisited: Tort Recovery by a Commercial Buyer for a Defective Product's Self-Inflicted Damage (1985), 84 Mich. L. Rev. 517, 521-524, the better practice is to analyze such damage within the context of the transaction, considering the relationship between the parties, the nature of the product's defect, and the manner in which the damages were sustained. Accordingly, the determination of whether recovery in tort is available for damage to the defective product itself requires more than a simple labeling of that damage as "property" or "economic."

## A

In Count I of its third-party complaint, Lexington alleges numerous instances of Midland-Ross' negligence in the design, manufacture, and installation of the arch dryer. For actions sounding in negligence, "[t]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Nebraska Innkeepers, Inc.* v. *Pittsburgh-Des Moines Corp.* (Iowa 1984), 345 N.W. 2d 124, 126. Accord *Local Joint Exec. Bd. of Las Vegas, Culinary Workers Union, Local No. 226* v. *Stern* (1982), 98 Nev. 409, 410-411, 651 P. 2d 637, 638. See, also, Note, Economic Loss, *supra,* at 929 (noting that "[n]egligence has proved to be among the least fruitful avenues for recovery of economic loss"). As summarized by Dean Prosser:

"There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself, as where an automobile is wrecked by reason of its own bad brakes, as well as damage to any other property in the vicinity. But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the

value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule * * * that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery." (Footnotes omitted.) Prosser, Law of Torts (4 Ed. 1971) 665, Section 101.

Numerous jurisdictions have subsequently cited this passage in denying recovery in negligence for purely economic loss. See, *e.g.*, *Affiliates for Evaluation & Therapy, Inc.* v. *Viasyn Corp.* (Fla. App. 1987), 500 So. 2d 688, 691-692; *Long* v. *Jim Letts Oldsmobile, Inc.* (1975), 135 Ga. App. 293, 295, 217 S.E. 2d 602, 604; *Clark* v. *Internatl. Harvester Co.* (1978), 99 Idaho 326, 333, 581 P. 2d 784, 791.

The law of Ohio has been in accord with this majority view. In *Inglis* v. *American Motors Corp.* (1965), 3 Ohio St. 2d 132, 32 O.O. 2d 136, 209 N.E. 2d 583, paragraph one of the syllabus, we held that "[i]n an action involving product liability based on negligence against the manufacturer of the product by a buyer of the product not in privity of contract with the manufacturer, there is no liability for pecuniary loss of bargain."

The reason for denying recovery in negligence for purely economic loss lies not in a failure to find "negligent" conduct by the manufacturer, nor in a lack of proximate relationship between that conduct and the consumer's injury. Rather, the key factor is the extent, and more important, the source, of the duty owed by the manufacturer to the consumer. In negligence, the law imposes upon the manufacturer of a product the duty of reasonable care. That duty protects the consumer from physical injury, whether to person or property. However, the law of negligence does not extend the manufacturer's duty so far as to protect the consumer's economic expecta-

tions, for such protection would arise not under the law but rather solely by agreement between the parties. "[W]hen the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the term of the bargain arises only from the contract." *Battista* v. *Lebanon Trotting Assn.* (C.A. 6, 1976), 538 F. 2d 111, 117, quoted in *Cincinnati Gas & Elec. Co., supra*, at 61. See, also, *Clark, supra*, at 336, 581 P. 2d at 794 (concluding that "judicial expansion of negligence law to cover purely economic losses would only add more confusion in an area already plagued with overlapping and conflicting theories of recovery").

In the instant case, Midland-Ross provided Chemtrol with an arch dryer pursuant to the contract between them. If the defect in the arch dryer had caused personal injury or damage to other property of Chemtrol, Midland-Ross might be found to have breached its duty of care imposed by law, and recovery in negligence would accordingly lie. However, Chemtrol's losses here were economic, *i.e.*, additional expenses incurred because the Midland-Ross arch dryer did not perform as expected. Midland-Ross' duty to provide a working arch dryer arose not under the law of negligence but rather under its contract with Chemtrol. Accordingly, it is the law of contracts, and not the law of negligence, to which Chemtrol must look for a remedy. *Cincinnati Gas & Elec. Co., supra*, at 60-61.

Here again, however, we see the problem with classifying a product's self-inflicted damage. As noted in Dean Prosser's passage above, "property damage to the defective chattel itself" may be recovered in negligence, while "the cost of repairing it" is not similarly protected. For an ordinary consumer, *i.e.*, one not in privity of

contract with the seller or manufacturer against whom recovery is sought, an action in negligence may be an appropriate remedy to protect the consumer's property interests. However, where the buyer and seller are in privity of contract, and they have negotiated that contract from relatively equal bargaining positions, the parties are able to allocate the risk of all loss, including loss of the subject product itself, between themselves. Therefore, any protection against the product's self-inflicted damage in the latter context is better viewed as arising under the contract and not under the law of negligence.

## B

Lexington's third-party complaint also alleges tort liability for breach of various express and implied warranties. In Ohio, there has been some confusion about the difference between tort actions sounding in breach of express or implied warranty and tort actions sounding in strict liability. Undoubtedly much of the confusion derives from the use of the word "warranty," which suggests contract and its attendant requirement of privity. Indeed, the implied warranty action has been described as a "hybrid" action, with its "commencement in contract and its termination in tort." *Santor* v. *A & M Karagheusian, Inc.* (1965), 44 N.J. 52, 64, 207 A. 2d 305, 311. However, as we stated in *Iacono* v. *Anderson Concrete Co., supra,* at 91, 71 O.O. 2d at 68, 326 N.E. 2d at 269, fn. 1, "[t]his court has recognized that, historically, an action grounded on breach of warranty sounded in tort rather than contract. It is a mistaken notion that use of the term 'warranty' always carried the implication of a contractual relationship. *Rogers* v. *Toni Home Permanent Co.* (1958), 167 Ohio St. 244, 147 N.E. 2d 612.''

While *Iacono* did not discuss the doctrine of strict liability, an earlier decision of this court, *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, 35 O.O. 2d 404, 218 N.E. 2d 185, cited 2 Restatement of the Law 2d, Torts (1965) 347-348, Section 402A, and the landmark case of *Greenman* v. *Yuba Power, supra,* in recognizing a cause of action for breach of implied warranty in the absence of privity. *Id.* at 239, 35 O.O. 2d at 411, 218 N.E. 2d at 193-194. Section 402A was subsequently approved and adopted in *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 322, 4 O.O. 3d 466, 469, 364 N.E. 2d 267, 271, in which we recognized that "there are virtually no distinctions between Ohio's 'implied warranty in tort' theory and the Restatement version of strict liability in tort * * *.'' Accordingly, the two theories have been used interchangeably and analyzed together. See *Avenell* v. *Westinghouse Elec. Corp.* (1974), 41 Ohio App. 2d 150, 156, 70 O.O. 2d 316, 320, 324 N.E. 2d 583, 588, fn. 5 (citing Note, Product Liability: A Synopsis [1967], 30 Ohio St. L. J. 551).

Two cases are universally recognized as the seminal decisions on the question of whether economic loss is recoverable in a strict liability action: *Santor* v. *A & M Karagheusian, Inc., supra,* and *Seely* v. *White Motor Co.* (1965), 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P. 2d 145. In *Santor,* the New Jersey Supreme Court held that a plaintiff who had purchased carpeting from a third-party distributor could recover direct economic loss from the manufacturer under theories of implied warranty of merchantability and strict liability. As to the implied warranty theory, the court recognized that "[t]here is no doubt that the great mass of warranty cases imposing liability on the manufacturer regardless

of lack of privity were concerned with personal injuries to the ultimate consumer." *Id.* at 59, 207 A. 2d at 308. However, the court refused to distinguish cases where the only damage is loss of value of the article sold, reasoning that "since 'the basis of liability turns not upon the character of the product [*i.e.,* whether, if defective, it is likely to cause personal injury] but upon the representation, there is no justification for a distinction on the basis of the type of injury suffered or the type of article or goods involved.' " *Id.* at 61, 207 A. 2d at 309 (quoting *Randy Knitwear, Inc.* v. *American Cyanamid Co.* [1962], 11 N.Y. 2d 5, 15, 226 N.Y. Supp. 2d 363, 370, 181 N.E. 2d 399, 404). The court thereafter observed that "the manufacturer's liability may be cast in simpler form," *i.e.,* strict liability in tort. *Santor* at 63, 207 A. 2d at 311.

In *Seely,* the California Supreme Court allowed a truck purchaser to recover both direct and indirect economic loss (lost profits and loss of the purchase price) from the manufacturer pursuant to an express warranty in the purchase order, but also held that a strict liability theory could not be used to recover for purely economic

loss. On the latter issue, the court stated that "[t]he history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or of the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries." *Id.* at 15, 45 Cal. Rptr. at 21, 403 P. 2d at 149. In the court's view, the rules of warranty are best suited to govern the issue of recovery for commercial losses.[3]

Shortly after *Seely* and *Santor* were decided, commentators extensively analyzed the policies and principles on which each was based. See, *e.g.,* Note, Economic Loss, *supra;* Note, Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages — Tort or Contract? (1966), 114 U. Pa. L. Rev. 539; Note, Manufacturers' Strict Tort Liability to Consumers for Economic Loss (1967), 41 St. John's L. Rev. 401. Subsequently, the overwhelming majority of jurisdictions considering the questions raised therein have followed the *Seely* view, holding that economic losses generally are not recoverable in a tort action. See, *e.g., Moorman Mfg. Co.* v. *Natl. Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E. 2d 443; *Superwood Corp.* v.

---

[3] In the words of Chief Justice Traynor:

"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees

that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone. * * * The Restatement of Torts similarly limits strict liability to physical harm to person or property. * * *" (Citations omitted.) *Seely, supra,* at 18, 45 Cal. Rptr. at 23, 403 P. 2d at 151.

*Siempelkamp Corp.* (Minn. 1981), 311 N.W. 2d 159.[4] However, there has also been some support for the *Santor* view. See, *e.g.*, *Mead Corp.*, *supra* (economic loss recoverable on a theory of strict liability); *State, ex rel. Western Seed Production Corp.,* v. *Campbell* (1968), 250 Ore. 262, 442 P. 2d 215 (negligence); *Berg* v. *General Motors Corp.* (1976), 87 Wash. 2d 584, 555 P. 2d 818 (negligence); *La Crosse* v. *Schubert, Schroeder & Assoc., Inc.* (1976), 72 Wis. 2d 38, 240 N.W. 2d 124 (strict liability).

Prior decisions of this court appear to favor the *Santor* approach. In *Inglis* v. *American Motors Corp., supra,* a purchaser of an automobile sued to recover the difference between the amount he had paid for the automobile and the automobile's actual value in light of its substantially defective condition. While rejecting plaintiff's negligence theory, we nevertheless held that plaintiff could recover the direct economic loss sustained despite his lack of privity on a theory of "express warranty."[5]

Later, in *Iacono* v. *Anderson Concrete Corp., supra,* this court held that

---

[4] In both *Moorman* and *Superwood* the courts rejected tort claims sounding in strict liability as well as in negligence. Some cases adopting the *Seely* view have broadly rejected "tort" actions or "products liability" actions, while others have more specifically discussed negligence and/or strict liability. See, *e.g.*, *Morrow* v. *New Moon Homes, Inc.* (Alaska 1976), 548 P. 2d 279, 285-286 (strict liability); *Salt River Project Agricultural Improvement & Power Dist.* v. *Westinghouse Elec. Corp.* (1984), 143 Ariz. 368, 379-380, 694 P. 2d 198, 209-210 (strict liability); *Richard O'Brien Companies* v. *Challenge-Cook Bros., Inc.* (D. Colo. 1987), 672 F. Supp. 466, 471-473 (applying Colorado law; strict liability and negligence); *Long Mfg., N.C., Inc.* v. *Grady Tractor Co.* (1976), 140 Ga. App. 320, 323, 231 S.E. 2d 105, 108 (strict liability); *Adkison Corp.* v. *American Bldg. Co.* (1984), 107 Idaho 406, 410-411, 690 P. 2d 341, 345-346 (implied warranty and negligence); *Prairie Production, Inc.* v. *Agchem Division-Pennwalt Corp.* (Ind. App. 1987), 514 N.E. 2d 1299, 1304-1306 (negligence); *Nelson* v. *Todd's Ltd.* (Iowa 1988), 426 N.W. 2d 120, 123 (strict liability); *Frey Dairy* v. *A.O. Smith Harvestore Products, Inc.* (E.D. Mich. 1988), 680 F. Supp. 253, 256 (applying Michigan law; all tort remedies); *Natl. Crane Corp.* v. *Ohio Steel Tube Co.* (1983), 213 Neb. 782, 790, 332 N.W. 2d 39, 44 (strict liability and negligence); *Central Bit Supply, Inc.* v. *Waldrop Drilling & Pump,* *Inc.* (1986), 102 Nev. 139, 140-141, 717 P. 2d 35, 36 (strict liability and negligence); *Pub. Service Co. of New Hampshire* v. *Westinghouse Elec. Corp.* (D.N.H. 1988), 685 F. Supp. 1281, 1284-1287 (applying New Hampshire law; strict liability and negligence); *Colonial Park Country Club* v. *Joan of Arc* (C.A.10, 1984), 746 F. 2d 1425, 1428 (applying New Mexico law; products liability); *Hagert* v. *Hatton Commodities, Inc.* (N.D. 1984), 350 N.W. 2d 591, 595 (strict liability); *Aloe Coal Co.* v. *Clark Equip. Co.* (C.A.3, 1987), 816 F. 2d 110, 117, certiorari denied (1987), 484 U.S. ___, 98 L. Ed. 2d 111, 108 S. Ct. 156 (applying Pennsylvania law; negligence); *Purvis* v. *Consol. Energy Products Co.* (C.A.4, 1982), 674 F. 2d 217, 222 (applying South Carolina law; strict liability); *Corporate Air Fleet of Tennessee, Inc.* v. *Gates Learjet, Inc.* (M.D. Tenn. 1984), 589 F. Supp. 1076, 1080 (applying Tennessee law; strict liability); *Star Furniture Co.* v. *Pulaski Furniture Co.* (W. Va. 1982), 297 S.W. 2d 854, 859 (strict liability).

[5] Early in the evolution of products liability jurisprudence, this court recognized a cause of action for breach of express warranty to recover for personal injury, despite the lack of privity between the plaintiff, an "ultimate purchaser," and the defendant manufacturer. *Rogers* v. *Toni Home Permanent Co.* (1958), 167 Ohio St. 244, 4 O.O. 2d 291, 147 N.E. 2d 612, paragraph three of the syllabus.

an action in tort on a theory of breach of implied warranty may be maintained to recover for damage to property. *Id.* at syllabus. We saw no reason to distinguish between property damage and personal injury, for which a cause of action for breach of implied warranty had previously been recognized in *Lonzrick* v. *Republic Steel Corp., supra.*[6] *Iacono, supra,* at 93, 71 O.O. 2d at 69, 326 N.E. 2d at 270. However, while the damages sustained in *Iacono* were described as "property" damage, they were in fact merely defects in the product itself which reduced the product's value, *i.e.,* economic damages. *Mead Corp., supra,* at 366; Note, Recovery of Direct Economic Loss: The Unanswered Questions of Ohio Products Liability Law (1977), 27 Case W. Res. L. Rev. 683, 685-690. Thus, taken together, *Inglis* and *Iacono* stand for the proposition that in Ohio an action in tort for breach of express or implied warranty, or an action in strict liability, may be maintained for purely economic loss. However, notably absent from these cases is the element of privity of contract between the injured plaintiff and the manufacturer-defendant. Accordingly, they do not answer the precise question raised today, *i.e.,* whether economic loss may be recovered in strict liability where the parties *are* in privity of contract. See *Cincinnati Gas & Elec. Co., supra,* at 58.

On this question we find the opinion of the Court of Appeals for Cuyahoga County in *Avenell* v. *Westinghouse Elec. Corp., supra,* persuasive. In *Avenell,* the Toledo Edison Company purchased from Westinghouse a turbine generator which subsequently broke down, resulting in loss of profits and other consequential damages. Avenell, as assignee and subrogee of Toledo Edison, sued Westinghouse on various tort theories. The court first noted that a "plaintiff in a product liability case may bring an action in tort based upon the theory of implied warranty." *Avenell, supra,* at 156, 70 O.O. 2d at 320, 324 N.E. 2d at 587. However, the court stressed that the doctrine of implied warranty was designed to protect consumers not covered by contractual sales warranties because of the lack of privity. *Id.* at 157, 70 O.O. 2d at 320, 324 N.E. 2d at 588. Accordingly, where privity of contract existed the theory of implied warranty was unnecessary, and its application would in fact have the adverse consequence of negating contractual provisions for which the parties had clearly bargained:

"Application of the doctrine of implied warranty in tort to all products liability cases would render useless many, if not all, of the Uniform Commercial Code provisions involving products liability. For example, * * * whenever the doctrine of implied warranty in tort is applicable, the provisions of the Uniform Commercial Code

---

[6] In *Lonzrick,* this court held that in a products liability case, "there are three possible causes of action which the plaintiff may pursue:

"(1) An action in tort which is grounded upon negligence. * * *

"(2) A cause of action which is based upon contract. * * * [and]

"(3) An action in tort which is based upon the breach of a duty assumed by the manufacturer-seller of a product [implied warranty in tort] * * *." *Id.* at 229-230, 35 O.O. 2d at 405-406, 218 N.E. 2d at 188. However, we note that, contrary to Lexington's suggestion, *Lonzrick* certainly does not stand for the proposition that all three *possible* causes of action are available in every case. As an obvious example, an action based upon contract is only available where a contractual relationship exists between the plaintiff and the defendant. *Id.* at 229, 35 O.O. 2d at 405, 218 N.E. 2d at 188.

permitting the parties to contractually modify or exclude warranties, and to modify or limit remedies are of no avail. Stated another way, where implied warranty in tort applies, the parties are not free to determine by contract the quality of goods which the seller is bound to deliver or the remedies available to the buyer in the event that the goods do not measure up to the agreed quality. It is clear, then, that the doctrine of implied warranty in tort must be limited in its applicability. Otherwise, unlimited application of the doctrine would emasculate the Uniform Commercial Code provisions dealing with products liability." *Id.* at 157-158, 70 O.O. 2d at 321, 324 N.E. 2d at 588. Accord *Superwood Corp.* v. *Siempelkamp Corp., supra,* at 162.

Our belief that *Avenell* represents the overwhelming majority view is strongly supported by the United States Supreme Court's recent decision in *East River Steamship Corp.* v. *Transamerica Delaval, Inc.* (1986), 476 U.S. 858, which rejected negligence and strict liability claims in admiralty where the parties are commercial entities in privity of contract and the only injury claimed is economic loss. We also find persuasive the New Jersey Supreme Court's decision in *Spring Motors Distributors, supra,* in which the court held that "a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the U.C.C., *but not in strict liability or negligence.* * * *"

(Emphasis added.) *Id.* at 561, 489 A. 2d at 663. In finding that its earlier decision in *Santor* was not controlling, the court stressed that *Santor* determined the rights of an ultimate consumer not in privity of contract with the manufacturer, and did not involve an action between commercial parties. *Spring Motors* at 575, 489 A. 2d at 670. See, also, *Cincinnati Gas & Elec. Co., supra,* at 58 (distinguishing *Mead Corp., supra*); *Richard O'Brien Companies* v. *Challenge-Cook Bros., Inc.* (D. Colo. 1987), 672 F. Supp. 466, 472 (distinguishing *Hiigel* v. *General Motors Corp.* [1975], 190 Colo. 57, 544 P. 2d 983). While the court in *Spring Motors* noted the substantial criticism of *Santor,* it declined to reconsider that decision. *Spring Motors* at 574-575, 489 A. 2d at 670.[7]

We find the above analysis of economic losses applies equally to Chemtrol's consequential business expenses and to the damage sustained by the arch dryer itself. As to the latter, some courts have held that where the defect poses an unreasonable danger to persons or to other property of the buyer, recovery in strict liability is available despite the "fortuity" that only the defective product was damaged. See, *e.g., Cloud* v. *Kit Mfg. Co.* (Alaska 1977), 563 P. 2d 248; *Star Furniture Co.* v. *Pulaski Furniture Co.* (W. Va. 1982), 297 S.E. 2d 854. However, we agree that "where the loss to a defective product alone occurs in such a way as to pose no unreasonable danger of harm to person or other property, then UCC remedies will generally be appropriate and exclusive for recovery of the damage to the defective product

---

[7] Accordingly, we also need not reconsider the question whether, absent privity of contract, a plaintiff can recover purely economic losses under tort theories. While *Inglis* and *Iacono* held that such a plaintiff could recover, those decisions relied upon *Santor,* which has subsequently come to represent the minority view and has been the subject of substantial criticism.

itself. * * *" *Salt River Project Agricultural Improvement & Power Dist.* v. *Westinghouse Elec. Corp.* (1984), 143 Ariz. 368, 379, 694 P. 2d 198, 209 (citing *Posttape Assoc.* v. *Eastman Kodak Co.* [C.A.3, 1976], 537 F. 2d 751). In this case we find that the air-intake fan's lack of an automatic shut-off mechanism, the primary defect alleged in this case, was not a defect that posed an unreasonable risk of harm to persons or to other property of Chemtrol. Thus, strict liability will not lie to recover for the arch dryer's self-inflicted damage.

### C

In summary, we hold that a commercial buyer seeking recovery from the seller for economic losses resulting from damage to the defective product itself may maintain a contract action for breach of warranty under the Uniform Commercial Code; however, in the absence of injury to persons or damage to other property the commercial buyer may not recover for economic losses premised on tort theories of strict liability or negligence. In this case, then, Chemtrol's remedies against Midland-Ross would be limited to those available under the contract between them. Accordingly, Lexington's remedies are similarly limited, and thus we affirm the court of appeals' judgment upholding the trial court's dismissal of claims sounding in tort.[8]

### II

Having found that contractual

remedies alone are available to Lexington, we must now decide whether those remedies have been lost. Midland-Ross moved for summary judgment on the contract claims on grounds of Chemtrol's "failure, *as a matter of law,* to provide Midland-Ross with adequate and timely notice of any alleged breach by Midland-Ross." (Emphasis *sic.*) According to Midland-Ross, it received "no notice of the alleged breaches until December, 1982 when American and Lexington brought actions against it." Both the trial court and the court of appeals agreed. However, Lexington argues that Midland-Ross knew of the damage and in fact inspected Chemtrol's facility shortly after the damage occurred.

R.C. 1302.65(C) provides:

"Where a tender has been accepted:

"(1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy * * *."

We must determine what constitutes notice of breach and whether such notice was given within a reasonable time in this case.

At the outset, we stress the well-established rule that the "determination of a reasonable time and the adequacy of notice to the seller are ordinarily questions of fact." *Kabco Equip. Specialists* v. *Budgetel, Inc.* (1981), 2 Ohio App. 3d 58, 61, 2 OBR 65, 68, 440 N.E. 2d 611, 614; *Allen Food Products, Inc.* v. *Block Bros., Inc.*

---

[8] Since both the trial court and the court of appeals found no UCC remedy available because of the inadequacy of notice to Midland-Ross, Lexington was left with no remedy at all. Other courts have held that the "existence of a contract remedy is irrelevant to the determination of whether contract or tort law provides the appropriate set of rules for recovery of

damages. * * *" *Oakbrook Terrace* v. *Hinsdale Sanit. Dist.* (1988), 172 Ill. App. 3d 653, ___, 527 N.E. 2d 70, 74 (citing *Anderson Elec., Inc.* v. *Ledbetter Erection Corp.* [1986], 115 Ill. 2d 146, 153, 503 N.E. 2d 246, 249). Accordingly, whether Lexington is barred from bringing its contract action under the UCC has no bearing on our holding that tort theories are unavailable.

(S.D. Ohio 1980), 507 F. Supp. 392, 394; *Agway, Inc.* v. *Teitscheid* (1984), 144 Vt. 76, 80, 472 A. 2d 1250, 1253. A trial court should be reluctant to grant summary judgment on the grounds that notice of breach was untimely as a matter of law.

The Official Comment following R.C. 1302.65 provides somewhat contradictory guidance as to how the notice requirement is to be construed:

"* * * The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (RC § 1302.63 [UCC 2-605]). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Chapter need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

Some cases have focused on the more lenient clauses in the comment, stressing that the notice need not be a claim for damages or threaten litigation, see, *e.g., Computer Strategies, Inc.* v. *Commodore Business Machines, Inc.* (1984), 105 App. Div. 2d 167, 483 N.Y. Supp. 2d 716; *Paulson* v. *Olson Implement Co.* (1982), 107 Wis. 2d 510, 319 N.W. 2d 855, or that notice is sufficient if it says the transaction is still "troublesome" and must be watched, see, *e.g., Prutch* v. *Ford Motor Co.* (Colo. 1980), 618 P. 2d 657. Other courts have adopted a strict standard, stressing that the notice must indicate that the transaction is " 'claimed to involve a breach.' " *Eastern Air Lines, Inc.* v. *McDonnell Douglas Corp.* (C.A.5, 1976), 532 F. 2d 957, 976. See, generally, Hammond, Notification of Breach Under Uniform Commercial Code Section 2-607(3)(a): A Conflict, A Resolution (1985), 70 Cornell L. Rev. 525.

Prior cases interpreting Ohio law appear to have endorsed the strict standard. For example, in *Standard Alliance Industries, Inc.* v. *Black Clawson Co.* (C.A.6, 1978), 587 F. 2d 813, certiorari denied (1979), 441 U.S. 923, the court held that notice of breach was not timely despite evidence that the seller knew its machine was defective, knew that its repair attempts were inadequate, and knew that "it was in breach of the repair or replacement warranty." *Id.* at 824. On the specific question presented, "whether it was necessary to give additional notice of the failure of repair efforts," the court stated: "The express language of the statute [UCC Section 2-607(3)(a), codified in Ohio in R.C. 1302.65(C)(1)] and the official comment mandate notice regardless [of] whether either or both parties had actual knowledge of breach." *Id.* at 825. Subsequent cases from the Court of Appeals for the Sixth Circuit reiterate the strict view. See *Roth Steel Products* v. *Sharon Steel Corp.* (C.A.6, 1983), 705 F. 2d 134; *K & M Joint Venture* v. *Smith Internatl., Inc.* (C.A.6, 1982), 669 F. 2d 1106.

A situation similar to that in *Standard Alliance* is presented in the instant case. Lexington relies on two affidavits to support its argument that Midland-Ross had knowledge of the breakdown soon after its occurrence, and thus did receive timely notice of its breach. Jerome H. Wise, a former employee of Chemtrol, testified in pertinent part:

"* * * I was employed by Chemtrol when certain heat exchanger coils, supplied by Midland Ross in connection with the sale to Chemtrol of an arch dryer oven system, suffered freeze damage in December 1980.

"* * * I was involved in Chemtrol's efforts to resume operations following such damage, and recall contacting Mr. Ed Burke of Midland Ross concerning this loss and damage prior to my leaving Chemtrol in January 1981."

The other affidavit is that of Thomas E. Crowley, Jr., an insurance adjustor. Crowley testified that he was asked to investigate the loss at the Chemtrol plant on Lexington's behalf. As to what transpired during his investigation, Crowley testified:

"* * * During this meeting [with Chemtrol representatives] and subsequent meetings held at Chemtrol's plant, I was told by Chemtrol personnel that as a result of the freezing episodes of December 1980, Midland Ross recommended replacement of the water heat exchange medium with an anti-freeze liquid in the heat exchanger coils, which were damaged in December 1980, and that this recommendation was implemented prior to August 5, 1981.

"* * * During the course of my investigation and prior to Lexington's filing of suit against Midland Ross, I had at least one discussion with Mr. Eugene Bulgrin of Midland Ross' corporate insurance department, in which I informed him that I was investigating the December 1980 loss and damage and the failure of Midland Ross' heat recovery system on Lexington's behalf.

"* * * Based upon my personal observations and discussions with Chemtrol personnel between August 5, 1981 and the date suit was filed against Midland Ross by Lexington, I know Midland Ross personnel were present at Chemtrol's plant on a number of occasions between December 1980 and the date suit was filed. I believe the dates, times and purposes for such visits would be embodied in documents and reports maintained by Midland Ross, which I have never had the opportunity to review."

With its motion for summary judgment, Midland-Ross presented the affidavit of Eugene J. Kurie, a division manager for Midland-Ross, who testified: "Prior to December, 1982 Midland Ross Corporation received no notice of any claimed breach with respect to the sale of the heat recovery system to Chemtrol Adhesives, Inc." Midland-Ross also relies on Chemtrol's response to an interrogatory which indicates that no notice was provided to Midland-Ross.[9]

Based upon our review of the record we find that the trial court was in error in concluding as a matter of law that the notice to Midland-Ross was inadequate. We stress that before summary judgment is granted a trial court must find that " '* * * (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion and view-

---

[9] "INTERROGATORY NO. 1: Please state the date of the first notice, if any, and each subsequent notice, that you provided Midland Ross Corporation of the alleged failure, malfunction, breach or defect that forms the basis of this action.

"ANSWER:

"Chemtrol has no present knowledge that any such notice was provided."

ing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.' " *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 117, 522 N.E. 2d 489, 505 (quoting *Temple* v. *Wean United, Inc., supra,* at 327, 4 O.O. 3d at 472, 364 N.E. 2d at 274).

In the instant case, construing the evidence above in the light most favorable to Lexington, we cannot say as a matter of law that reasonable minds can come to but one conclusion. We recognize that written notice is not required under R.C. 1302.65(C)(1), and in many circumstances oral notice of breach has been found sufficient. See, *e.g., Shooshanian* v. *Wagner* (Alaska 1983), 672 P. 2d 455; *Delano Growers' Coop. Winery* v. *Supreme Wine Co.* (1985), 393 Mass. 666, 473 N.E. 2d 1066. While Chemtrol admits in effect that no formal notice was given, reviewing the Wise and Crowley affidavits a reasonable person could conclude that Midland-Ross had knowledge of the damage sustained by Chemtrol shortly after the damage occurred. A reasonable person could infer that this knowledge was provided by Chemtrol notwithstanding the lack of direct evidence that notice of the damages was so provided. We reject the strict reading of R.C. 1302.65(C)(1) in *Standard Alliance* and the cases succeeding it, as we believe that notice may be sufficient under the statute despite the fact that the notice does not specifically allege a breach of the contract. Moreover, in our view, the statute was not meant to exclude the possibility that notice may be inferred. See, *e.g., Crest Container Corp.* v. *R.H. Bishop Co.* (1982), 111 Ill. App. 3d 1068, 1077, 445 N.E. 2d 19, 26 (visits

by employee of defendant manufacturer during which he observed product's failure to operate, combined with prior requests for service by the buyer, constituted notice to manufacturer). Accordingly, the trial court erred in granting summary judgment to Midland-Ross on Lexington's breach of contract claim.

If the fact-finder on remand determines that notice was not given shortly after the damages occurred, the question then becomes whether Lexington's filing of its third-party complaint constituted sufficient notice. Since notice of breach is a condition precedent to bringing an action for recovery, many courts have held that the filing of the complaint cannot constitute adequate notice. See, *e.g., Armco Steel Corp.* v. *Isaacson Structural Steel Co.* (Alaska 1980), 611 P. 2d 507; *Lynx, Inc.* v. *Ordnance Products, Inc.* (1974), 273 Md. 1, 327 A. 2d 502. We decline to adopt such an absolute rule, as we believe in a proper case the filing of a civil complaint could serve as notice of breach. However, this is not such a case, as Lexington's suit was filed a full two years after the damages were sustained. We agree with the courts below that Lexington's third-party complaint would be inadequate notice as a matter of law.

### III

The final issue presented for our review is the validity of the "Warranty" and "Liability Limitation" provisions of the Chemtrol/Midland-Ross contract. Lexington challenges these provisions essentially on two grounds: first, that they are unconscionable; and second, that they cause the limited remedy of repair and/or replacement "to fail of its essential purpose."[10] Accordingly, Lexington claims entitle-

---

[10] R.C. 1302.93(B) provides in part: "Where circumstances cause an ex-

clusive or limited remedy to fail of its essential purpose, remedy may be had as pro-

ment to the full range of remedies available under R.C. Chapters 1303 through 1309 which range includes, *inter alia*, recovery for incidental and consequential damages pursuant to R.C. 1302.88(C) and 1302.89.

Contracting parties are free to determine which warranties shall accompany their transaction. Accordingly, both the implied warranties of merchantability and of fitness may be excluded or modified, if the exclusion or modification meets the criteria set forth in R.C. 1302.29(B). The written Chemtrol/Midland-Ross contract provided such an exclusion: "* * * THE WARRANTY STATED HEREIN IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR PARTICULAR USE." The warranty of merchantability was specifically mentioned, as required by R.C. 1302.29(B), and the fact that the exclusion is in capital letters under the heading "WARRANTY," while the bulk of the contract is in regular type, compels our conclusion that the exclusion is conspicuous.

Pursuant to R.C. 1302.29(D) and 1302.93(A)(1), the seller may also limit the buyer's remedies for breach of warranty to the repair or replacement of the defective product. In addition, liability for consequential damages may be limited or excluded "unless the limitation or exclusion is unconscionable." R.C. 1302.93(C). As the Editor's Analysis following R.C. 1302.93 in Page's Revised Code notes, there is no requirement that an exclusion of consequential damages be "conspicuous." However, in *Avenell, supra,* the court, quoting Nordstrom, Law of Sales (1970) 376, held that a clause limiting remedies " 'must be by a writing and conspicuous.' " *Id.* at 156, 70 O.O. 2d

vided in Chapters * * * [1301 through 1309, inclusive] of the Revised Code."

at 320, 324 N.E. 2d at 587. Here, the limitation of remedy for breach of warranty was set forth in a separate provision under a bold-faced heading titled "Liability Limitation," and was not in small print or otherwise obscured in any way. Therefore, since the limitation of liability in this case was clear and conspicuous, we need not address the question of whether an inconspicuous limitation would be enforceable.

As to appellant's first challenge, we agree with the Arizona Supreme Court that "[a]lthough a commercial purchaser is not doomed to failure in pressing an unconscionability claim, * * * findings of unconscionability in a commercial setting are rare." *Salt River Project, supra,* at 374, 694 P. 2d at 204 (citing White & Summers, Uniform Commercial Code [1972] 385-386). R.C. 1302.93(C) provides in part: "* * * Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable *but limitation of damages where the loss is commercial is not.*" (Emphasis added.) Numerous cases have held that in a situation such as the instant case, where there is no great disparity of bargaining power between the parties, a contractual provision which excludes liability for consequential damages and limits the buyer's remedy to repair or replacement of the defective product is not unconscionable. See, *e.g., Salt River Project, supra; Consol. Data Terminals* v. *Applied Digital Data Systems, Inc.* (C.A.9, 1983), 708 F. 2d 385, 392, fn. 6; *Byrd Motor Lines, Inc.* v. *Dunlop Tire & Rubber Corp.* (1983), 63 N.C. App. 292, 304 S.E. 2d 773.

As to its second challenge, Lexington cites two decisions to support its argument that the limitation-of-liability provision causes the remedy to fail of its essential purpose: *McCullough* v. *Bill Swad Chrysler-*

*Plymouth, Inc.* (1983), 5 Ohio St. 3d 181, 5 OBR 398, 449 N.E. 2d 1289, and *Goddard* v. *General Motors Corp.* (1979), 60 Ohio St. 2d 41, 14 O.O. 3d 203, 396 N.E. 2d 761. However, as Midland-Ross correctly notes, the plaintiffs therein attempted to avail themselves of the repair and/or replacement remedy and were completely frustrated. See *McCullough, supra,* at 181-182, 5 OBR at 399-400, 449 N.E. 2d at 1291; *Goddard, supra,* at 42-43, 14 O.O. 3d at 203-204, 396 N.E. 2d at 762-763. "Repair or replacement" remedies are designed "to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise." *Beal* v. *General Motors Corp.* (D. Del. 1973), 354 F. Supp. 423, 426. Such limited remedies generally fail only where the seller is unable or unwilling to make repairs within a reasonable time. See, *e.g., Clark* v. *Internatl. Harvester Co., supra,* at 340, 581 P. 2d at 798-799. See, generally, Eddy, On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2-719(2) (1977), 65 Calif. L. Rev. 28, 58-84. We note that the determination of whether a warranty has failed to fulfill its essential purpose is ordinarily a question of fact for the jury. *Cayuga Harvester, Inc.* v. *Allis-Chalmers Corp.* (1983), 95 App. Div. 2d 5, 465 N.Y. Supp. 2d 606; *Johnson* v. *John Deere Co.* (S.D. 1981), 306 N.W. 2d 231. However, in this case there is no evidence on which to base a finding that Midland-Ross was unable or unwilling to repair and/or replace the defective system within a reasonable time. Thus, it would be unreasonable as a matter of law to conclude that the remedy failed of its essential purpose. See *Tokio Marine & Fire Ins. Co., Ltd.* v. *McDonnell Douglas Corp.* (C.A.2, 1980), 617 F. 2d 936, 940-941.

Accordingly, we hold that both the "Warranty" and the "Liability Limitation" provisions of the Chemtrol/Midland-Ross contract are valid and enforceable. Thus, we need not decide whether the exclusion of consequential damages would remain enforceable if the repair-or-replacement remedy had failed of its essential purpose. See, *e.g., Johnson* v. *John Deere Co., supra,* at 238; cf. *Goddard, supra,* at 47, 14 O.O. 3d at 206, 396 N.E. 2d at 765; see, generally, Eddy, *supra,* at 84-92. From the itemized list set forth above of damages sustained by Chemtrol, it appears that most of the damages are expressly excluded under the contract. However, we remand this issue to the trial court for a determination of exactly which damages are excluded and for further proceedings in accordance with this opinion.

*Judgment affirmed in part,*
*reversed in part, and*
*cause remanded.*

MOYER, C.J., HOLMES, H. BROWN and RESNICK, JJ., concur.

SWEENEY and DOUGLAS, JJ., concur in part and dissent in part.

DOUGLAS, J., concurring in part and dissenting in part. I concur in paragraph one of the syllabus and the judgment of the majority. I respectfully dissent from paragraph two of the syllabus and the majority's discussion concerning recovery for economic losses premised on a tort theory of negligence.

While the majority opinion cites *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, 35 O.O. 2d 404, 218 N.E. 2d 185, it does so only in a passing fashion and fails to note that in *Lonzrick* the court said:

"This is a products liability case. In such a case, there are three possible

causes of action which the plaintiff may pursue:

"(1) An action in tort which is grounded upon negligence. Such cause of action does not require the allegation of a contractual relationship between the plaintiff and the defendant. * * *" *Id.* at 229, 35 O.O. 2d at 405, 218 N.E. 2d at 188.

Further, in *Iacono* v. *Anderson Concrete Corp.* (1975), 42 Ohio St. 2d 88, 71 O.O. 2d 66, 326 N.E. 2d 267, and *Inglis* v. *American Motors Corp.* (1965), 3 Ohio St. 2d 132, 32 O.O. 2d 136, 209 N.E. 2d 583, this court held that a plaintiff could maintain a tort action for damages that were solely economic. *Iacono* set forth the principle that Ohio courts will hold manufacturers liable on a tort theory for defectively made products even where no personal injuries are sustained. I would follow the dictates of these previous cases and, in addition to permitting a cause of action under the Uniform Commercial Code, I would permit appellant to proceed on its tort theory of negligence.

SWEENEY, J., concurs in the foregoing opinion.