**LIBERTY STEEL PRODUCTS, INC., Plaintiff,**

v.

**FRANCO STEEL CORPORATION, Defendant.**

**No. 4:98 CV 638.**

United States District Court, N.D. Ohio, Eastern Division.

July 22, 1999.

---

**460**

Stephen F. Gladstone, Colleen Christa Murnane, Thompson, Hine & Flory, Cleveland, OH, for Plaintiff.

David M. Cuppage, Alan Neil Hirth, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, OH, for Defendant.

### MEMORANDUM OPINION AND ORDER

NUGENT, District Judge.

This matter is before the Court upon Defendant Francosteel Corporation's (hereinafter "Francosteel") Motion for Summary Judgment (Document # 11) against Plaintiff Liberty Steel Products, Inc. (hereinafter "Liberty Steel"), which was filed with the Court on January 11, 1999. Plaintiff filed its Brief in Opposition on February 11, 1999. Thereafter, on February 18, 1999, Defendant filed a Re-

ply Brief in Support of its Motion for Summary Judgment. For the reasons that follow, Defendant's Motion for Summary Judgment is GRANTED.

### Procedural and Factual Background[1]

Plaintiff Liberty Steel filed the instant action against Francosteel in the Mahoning County Court of Common Pleas. On March 17, 1998, Francosteel filed a Notice of Removal in the United States District Court for the Northern District of Ohio. In its Complaint, Plaintiff alleges breach of contract and breach of implied warranty of fitness for a particular purpose relating to a purchase order issued by Liberty Steel to Francosteel dated May 31, 1996.

On or about May 31, 1996, following a telephone conference with Francosteel, Liberty Steel, by and through one of its buyers, Carl Blumensheim, issued a handwritten purchase order, via fax, to Francosteel's Dayton, Ohio office requesting approximately 100,000 pounds of plain hotrolled PVQ SA 14 Grade "G" steel at a rate of $20.75 per hundred weight. This handwritten fax was followed by a computer-generated confirmation of the order to Francosteel on June 1, 1996. Both orders requested a Mill Certificate to accompany the steel. Neither purchase order contained any standard "boilerplate" terms or conditions. Generally, when an order such as the above is placed, Liberty Steel forwards copies of the purchase order to its file for the purchasing department, to the salesperson, and to the receiving plant. Mr. Blumensheim is responsible for entering the purchase order into Liberty Steel's purchase order number log and for delivering a copy of the computer-generated purchase order to the sales department. Mr. Blumensheim also verbally communicates to the sales department that the purchase order was delivered to Francosteel.

1. The factual summary is based upon the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to Plaintiff, the non-moving party.

Gerald Bechert, Francosteel's District Sales Manager at the Dayton office, received both faxed orders at Francosteel's Dayton office. Upon receipt of the handwritten order, Mr. Bechert prepared an order transmittal sheet; he faxed the order, along with a "Hot Rolled Order Entry Sheet" on which he recorded Liberty Steel's order and the terms of the parties' agreement, and Liberty Steel's faxed purchase order, to Francosteel's New York headquarters. In preparing the Order Entry Sheet, however, Mr. Bechert mistakenly entered the wrong grade steel. Rather than entering an order for Grade "G" PVQ steel, he entered an order for Grade "C" PVQ steel. The discrepancy between the steel grades indicated on the Order Entry Sheet and Liberty Steel's original faxed purchase order was not discovered by Francosteel's product manager in its New York office. The Order Entry Sheet was forwarded to a sales assistant who, then, recorded the information into Francosteel's computer system. The sales assistant forwarded the order to the mill.

On or about June 11, 1996, Francosteel forwarded to Liberty Steel a "Sales Order Confirmation" which indicated that an order for PVQ SA 414 Grade "C" steel at $20.75 per hundred weight had been made by Liberty Steel. The Sales Order Confirmation provided that "Buyer agrees to give Seller written notice, within thirty (30) days of arrival of material, of any insurance claim concerning the condition of the merchandise. In the absence of such notice, the merchandise shall be deemed to conform to the terms of the contract in all respects." Further, the Confirmation included Terms and Conditions Incorporated in and Made a Part of the Order Confirmation which were not previously discussed or agreed to by the parties. Paragraph Five (5) of the Terms and Conditions states, in pertinent part, as follows:

Within five days after receipt of the material, but in no event later than 15 days after arrival of the material in the United States, Buyer shall give Seller written notice of any other claim Buyer may assert, and in particular as to quantity. If Buyer fails to give such notice, the material shall be deemed to conform to the terms of the contract in all respects.

The Order Confirmation also provided certain remedial language, specifically stating that Buyer's exclusive remedy shall be for damages, and Seller's liability "shall in no event exceed reimbursement of the amount already paid on the purchase price." Furthermore, Paragraph Six (6) of the Order Confirmation provides the following statement: "In no event shall Seller be liable to Buyer or anyone else for any special, incidental, consequential, or punitive damages of any kind." Finally, the Order Confirmation states that it constitutes the full understanding of the parties and that "Buyer's purchase order ... shall be subject in all respects to the terms and conditions of this Order Confirmation."

Both Liberty Steel and Francosteel have policies and procedures in place in which to make final checks on orders such as the one at issue herein. It is not in dispute that Francosteel's procedures in this instance failed. Francosteel's product manager in New York did not notice the error presumably made by Mr. Bechert in Dayton, nor did the sales assistant who was responsible for inputting the information from the Order Entry Sheet into Defendant's computer system and transmitting the order to the mill. In fact, Defendant admits through deposition testimony of Gerald Bechert that had Francosteel's sales assistant, Ms. Sophie Wasserman, simply checked the mill confirmation, which noted Grade "C" had been ordered, and compared it to the handwritten purchase order originally made by Liberty Steel, which noted that Grade "G" had been ordered, she could have discovered the error.

Likewise, Plaintiff's clerical staff is responsible for comparing Liberty Steel's purchase order to the sales order confir-

mation and for notifying the buyer, Mr. Blumensheim, of any discrepancy. Plaintiff's staff, however, did not discover the discrepancy at the time the paperwork was exchanged. Nonetheless, Plaintiff claims that, in this case, it reasonably relied on Francosteel to supply it with steel that met the performance characteristics of Grade "G" PVQ steel for a critical application, as requested.

In or about July and August of 1996, Francosteel delivered to Liberty Steel a total of four (4) coils of Grade "C" steel along with the following documentation: a shipping notice, a packing list, a bill of lading, a mill certificate, and an invoice. At least three of these documents referenced Grade "C" steel—the packing list, the mill certificate, and the invoice. The mill certificate was specifically requested by Plaintiff. The invoice quoted the price for Grade "G" steel, as agreed upon by the parties. Upon receipt of the steel, an employee of Liberty Steel unloaded the coils, tagged each coil with a number, and placed the coils in inventory. A clerk in Plaintiff's plant office entered the information gathered from the tags and accompanying paperwork into Plaintiff's computer system, failing to detect the error.

Thereafter, Liberty Steel processed three of the four coils of steel, cut them to length, and shipped the cut lengths to its downstream customer, The John Wood Company (hereinafter "John Wood"). Liberty Steel also provided John Wood with a Certificate of Analyses, dated September 5, 1996, certifying that it was delivering Grade "G" steel. The Certificate of Analyses provides a physical and chemical analysis of the product being delivered. It states specifically that the "physical and chemical analyses [set forth in the Certificate] were supplied by the producing mill or tested on our own equipment." Liberty Steel did not independently test the steel. A clerk prepared the Certificate by obtaining the physical and chemical analyses from Francosteel's mill certificate and other information such as the product descrip-

tion from Liberty Steel's computer records. Plaintiff states that this clerk, who is not trained in identifying the physical and chemical properties of steel, then placed the above information onto a pre-printed form signed by Liberty Steel's chief metallurgist, James Tomochek. Liberty Steel admits that while a metallurgist would have discovered the discrepancy in the paperwork due to the different chemistries of the two grades of steel, anyone could have discovered a difference between the letter "G" and the letter "C."

In or about July of 1997, almost one year after Francosteel's shipment of steel to Liberty Steel, Liberty Steel discovered that the wrong grade of steel had been delivered. Samuel Cannell, Liberty Steel's vice president of sales, was reviewing Liberty Steel's computer inventory records in order to fill another customer's order when he realized that the specifications listed for the steel delivered by Francosteel did not match the parameters for Grade "G" steel. At that point, Mr. Cannell checked the paperwork relating to the order placed with Francosteel in or about July of 1996, and he confirmed that Francosteel had incorrectly supplied Grade "C" steel rather than Grade "G" steel ordered by Plaintiff. Mr. Cannell immediately notified John Wood of the problem. Subsequently, Liberty Steel reimbursed John Wood, a valued customer, for incidental and consequential damages it had incurred due to the error.

Thereafter, in early July of 1997, Liberty Steel notified Francosteel of the error in steel grade for the first time. On July 1, 1997, Mr. Cannell prepared a rejection report, and on July 10, 1997, Plaintiff submitted a formal written claim to Francosteel. Plaintiff returned the one remaining Grade "C" coil to Francosteel. Francosteel has not refunded Plaintiff for the purchase price of the Grade "G" steel, nor has it refunded the purchase price of the one coil of Grade "C" steel Plaintiff returned to Francosteel in 1997.

## Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED.R.CIV.P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), *see also United States v. Hodges X–Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995) (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir.1995). The text of FED. R.CIV.P. 56(e) states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

*Id.* The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate.

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred that, " 'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.' " *Wiley v. United States*, 20 F.3d 222 (6th Cir.1994)

(quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir.1988)). Fed.R.Civ.P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225–26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect. The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249, 106 S.Ct. 2505. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

### Discussion

In its Complaint, Plaintiff alleges breach of contract and breach of implied warranty of fitness for a particular purpose relating to the purchase order of Grade "G" PVQ steel made by Liberty Steel to Francosteel. Specifically, Plaintiff contends that Francosteel is liable for the nonconforming goods delivered to Liberty Steel in or about July or August of 1996. Plaintiff further alleges that Francosteel's disclaimer of warranties and limitation of liability for consequential and incidental damages included within the Sales Order Confirmation prepared by Francosteel were not a part of the parties' contract. Additionally, Plaintiff claims that the limitation of liability provision fails of its essential purpose.

Defendant moves for summary judgment, however, claiming that it is entitled to judgment as a matter of law because Liberty Steel failed to provide timely notice to Francosteel of the alleged nonconformance of the steel, as required by the Uniform Commercial Code ("UCC") governing the parties. In the alternative, Defendant claims that it is entitled to summary judgment on Plaintiff's claim for breach of implied warranty and its claim for consequential and incidental damages based upon the valid contract provisions included in its Sales Order Confirmation.

The issues presented, therefore, are whether genuine issues of material fact exist as to the following: (1) whether Plaintiff, Liberty Steel, provided timely notification to Defendant Francosteel of the non-conforming steel; if so, (2) whether Defendant successfully negated the warranty of implied fitness for a particular purpose; and (3) whether Defendant suc-

cessfully limited the damages available to Plaintiff. Initially, however, the Court must decide which state's law shall be applied in this action—Ohio or New York.

## I. Choice of Law

Plaintiff asserts that the within action is governed by Ohio law, rather than New York law. Plaintiff states that the contract was negotiated and entered into in Ohio between Ohio parties: Liberty Steel, an Ohio corporation with its principal place of business in Ohio, and Francosteel's Dayton, Ohio office. Further, Plaintiff states that the contract was to be performed in Ohio; the steel was delivered to Liberty Steel in Ohio; and the alleged non-conformity was discovered in Ohio.

Defendant, on the other hand, claims that the action is governed by New York law. In response to Plaintiff's purchase order, Defendant forwarded to Liberty Steel a Sales Order Confirmation. The Sales Order Confirmation included a choice of law provision in its Terms and Conditions. Paragraph Eighteen (18) of the Confirmation states, "This contract shall be governed by and construed according to the laws of the State of New York. Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration to be held in New York, New York ..." Plaintiff, however, argues that the above choice of law provision, as attached to "boiler-plate terms and conditions," constitutes a material alteration of the terms of the sale, and it was not agreed to by the parties. Therefore, Plaintiff argues, the provision is excluded from the contract.

■ The choice of law in a diversity action is determined by applying the choice of law rules of the forum state. *Glenway Indust. Inc. v. Wheelabrator-Frye, Inc.,* 686 F.2d 415, 417 (6th Cir.1982) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Therefore, Ohio choice of law rules are applicable in the instant action.

■ The issue before the Court is whether the New York choice of law provision included within Defendant's Sales Order Confirmation is a part of the contract between the parties. Specifically, the Court must determine whether the additional terms—the choice of law—have been incorporated into the contract, or whether those additional terms are merely proposals for an addition to the contract. The Ohio Revised Code states, in pertinent part, as follows:

> (A) A definite and seasonable expression of acceptance or a written confirmation that is sent within a reasonable time operates as an acceptance even though it states terms additional or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> (B) The additional terms are to be construed as a proposal for addition to the contract. Between merchants, the terms become part of the contract unless one of the following applies:

> (1) The offer expressly limits acceptance to the terms of the offer;

> (2) They materially alter·it; or

> (3) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Oh.Rev.Code § 1302.10.

In the first place, Plaintiff's offer did not limit acceptance to its own terms. In fact, Plaintiff failed to include any terms in its offer. The purchase order merely provided, in addition to quantity, grade, and price, a request for mill certificates and a request that the steel be in "good shape for leveling." Further, the offer did not include standardized, or boiler-plate, terms and conditions. Therefore, the parties cannot be limited to Plaintiff's terms.

Plaintiff argues that the additional terms propounded by Defendant materially alter the contract. Official Comment 4

of § 1302.10 of the Ohio Revised Code addresses the term "materially altered." Comment 4 lists examples of clauses which would "materially alter" a contract and result in "surprise or hardship" if incorporated into the contract; a choice of law provision is not included. Furthermore, the Uniform Commercial Code ("UCC"), which governs the instant commercial action between merchants, has been adopted by both Ohio and New York in almost identical form. In fact, the UCC sections (New York and Ohio) which address the issues contained herein are identical. The element of surprise or hardship, therefore, is eliminated. Accordingly, the Court finds that Defendant's choice of law provision contained in the Terms and Conditions of the Sales Order Confirmation does not materially alter the contract between Liberty Steel and Francosteel.

Finally, additional terms may become part of a contract between merchants unless notification of objection to the terms is given within a reasonable time after notice of them is received. In *Ohio Grain Co. v. Swisshelm*, 40 Ohio App.2d 203, 318 N.E.2d 428 (Greene Cty.1973), the Court of Appeals for Greene County held that the buyer is bound to the terms of the seller's confirmation when it fails to object to such terms within a reasonable time. *See also Elgin Steel, Inc. v. Perfection Mfg. Corp.*, No. CA–1955, 1981 WL 6222 (Richland Cty., Apr. 14, 1981).

In this case, Plaintiff claims that it never agreed to the boiler-plate terms and conditions attached to Defendant's Sales Order Confirmation; however, it did not notify Defendant of its objections to such terms until the filing of the within Complaint. In fact, by the time Plaintiff objected to Defendant-seller's terms, Plaintiff had already taken possession of the steel, cut and further processed the steel for its downstream customer, and paid Defendant in full. Therefore, because Plaintiff did not object to Defendant's confirmation within a reasonable time, Plaintiff is bound by the terms of the Sales Order Confirmation and its Terms and Conditions attached thereto; the choice of law (New York) clause is a valid part of the contract between Liberty Steel and Francosteel.[2]

## II. Notice of Breach

■ It is not in dispute that the steel Francosteel delivered to Liberty Steel was non-conforming. However, Defendant contends that Plaintiff failed to timely notify Defendant of the non-conforming goods.

As previously stated, this action is governed by the Uniform Commercial Code. Section 2–607 of the UCC, which governs notice, states as follows: "Where a tender has been accepted, ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy ..." N.Y.U.C.C. § 2–607(3)(a); Oh.Rev.Code § 1302.65(C)(1). Likewise, a "[r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it ..." N.Y.U.C.C. § 2–608(2); Oh.Rev.Code § 1302.66(B); *Mount Vernon Mills, Inc. v. Murphy Textile Mills*, 148 A.D.2d 389, 539 N.Y.S.2d 334 (1989).

The UCC provides some guidance in determining what is a "reasonable time." It states that what is a reasonable time "depends on the nature, purpose, and circumstances of the action." N.Y.U.C.C. § 1–204(2); Oh.Rev.Code § 1301.10(B). Moreover, "the burden [of proof] is on the buyer to establish any breach with respect to the goods accepted." N.Y.U.C.C. § 2–607(4); Oh.Rev.Code § 1302.65(D); *Standard Alliance Ind. v. Black Clawson Co.*, 587 F.2d 813 (6th Cir.1978) ("... inasmuch as section 2–607 operates as a condition precedent to any recovery, the burden of

---

**2.** Notwithstanding this conclusion, as previously stated in this decision, the laws in both New York and Ohio are nearly identical as to the UCC issues concerning the parties. Therefore, the laws of both states may be considered simultaneously.

proof is on the plaintiff to show that notice was given within a reasonable time.").

The Official Comment to the UCC provides that the timeliness of notification, in an action such as this, is to be determined by applying commercial standards to a merchant buyer. Official Comment 4 to N.Y.U.C.C. § 2–607; Oh.Rev.Code § 1302.65. In noting the difference between a consumer and a merchant, it further provides:

'A reasonable time' for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

*Id.*

The New York courts have uniformly held that timely notice is governed by a reasonableness standard. *Cuba Cheese, Inc. v. Aurora Valley Meats, Inc.*, 113 A.D.2d 1012, 494 N.Y.S.2d 571 (1985); *General Electric Credit Corp. v. Xerox Corp.*, 112 A.D.2d 30, 490 N.Y.S.2d 407 (1985). This standard "is not inflexible"; reasonable time depends on the circumstances of each case. *Zahn v. Gulf Oil Corp., et al.*, 204 Misc. 678, 125 ·N.Y.S.2d 55 (1953), *aff'd*, 283 A.D. 951, 130 N.Y.S.2d 882 (1954).

The Sixth Circuit Court of Appeals in *Standard Alliance Ind. v. Black Clawson Co.*, 587 F.2d 813 (6th Cir.1978), in examining the policy reasons behind § 2–607 of the UCC, noted the importance of a notification of breach as a condition precedent to any remedy for breach of contract involving the sale of goods wherein those goods have been accepted. The Sixth Circuit determined that the UCC's notice provisions serve two policies:

First, express notice opens the way for settlement through negotiations between all parties. Second, proper notice minimizes the possibility of prejudice to the seller by giving him 'ample opportunity to cure the defect, inspect the goods, investigate the claim, or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties.'

*Standard Alliance Industries v. Black Clawson*, 587 F.2d 813, 826 (6th Cir.1978) (citations omitted).

What constitutes a "reasonable time," in Ohio and in New York, is generally a question of fact for the jury. *Cuba Cheese, Inc. v. Aurora Valley Meats, Inc.*, 113 A.D.2d 1012, 494 N.Y.S.2d 571 (1985); *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 51, 537 N.E.2d 624, 636 (1989). However, "as with any 'general rule,' [this rule] is not without its exceptions." *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.*, 701 F.2d 1049, 1051 (2d Cir.1983).

For example, the *Sherkate* Court cites to *Brown & Lowe Co. v. Potolski*, 221 A.D. 299, 223 N.Y.S. 71 (1927), wherein reasonableness was held to be a question of law. *Sherkate v. Henry R. Jahn & Son, Inc.*, 701 F.2d at 1051. In *Brown & Lowe Co.*, a buyer retained a paving machine for sixteen months and used it on two separate road contracts before attempting to reject it. Also, in *Bangor Clothing Co. v. Superior Sportswear Corp.*, 22 A.D.2d 864, 254 N.Y.S.2d 415 (1964), *aff'd*, 16 N.Y.2d 1018, 213 N.E.2d 312, 265 N.Y.S.2d 901 (1965), a buyer's claim of oil-stained and improperly cut suits was not made until six months after delivery of the suits, at which point it was incorporated into the buyer's answer to the seller's complaint, and the buyer continued to make payments on account. The court held that this delay in asserting that the suits were defective was unreasonable, as a matter of law, where the suits were delivered on November 15, 1963 and the claim was not made until April 22, 1964. *Id.*

In this case, the facts upon which the Court bases its decision are not in dispute. Defendant forwarded to Plaintiff a Sales Order Confirmation on June 11, 1996, acknowledging Defendant's receipt of Liber-

ty Steel's order for Grade "C" steel. This Confirmation was the first indication of a request for Grade "C" steel rather than Grade "G" steel. Plaintiff's policies and procedures governing purchase orders required that its clerical staff compare its purchase order to the sales order confirmation forwarded by Defendant and notify the buyer, Mr. Blumensheim, of any discrepancy. The discrepancy to be discovered is merely the difference between the letter "C" and the letter "G." Despite these procedures in place, however, Liberty Steel failed to detect the error.

Plaintiff had a second opportunity to detect the error in steel grade when the steel was delivered in July and August of 1996. The steel was delivered to Liberty Steel with three documents which clearly identified the steel as Grade "C" steel. These documents included the packing list, the mill certificate, and the invoice. In fact, the mill certificate, which also identified the physical and chemical characteristics of Grade "C" steel, was forwarded at the request of Plaintiff. While the clerical staff responsible for comparing paperwork on purchase orders may not be trained in identifying the chemical make-up of steel, they most certainly are capable of discerning between a "C" and a "G." Nonetheless, despite the above identifications, Plaintiff failed to discover the error.

Finally, at the very latest, Plaintiff had an opportunity to discover the error upon preparation of the steel for its downstream customer, John Wood. On or about September 5, 1996, Liberty Steel prepared a Certificate of Analyses for John Wood, certifying that it was delivering Grade "G" steel when, in fact, the steel was Grade "C." The clerk prepared the Certificate by obtaining the physical and chemical analyses from Francosteel's mill certificate and the product description from Liberty Steel's computer records. Liberty Steel's computer records indicated that a Grade "G" steel was ordered; Francosteel's documentation identified Grade "C" steel. Liberty Steel admits, through the deposition

testimony of Thomas Weigle, that anyone could have distinguished between the letter "C" and the letter "G" on the above documents.

The ease with which the discrepancy could have been discovered is apparent from the deposition testimony of Liberty Steel's vice president of sales, Samuel Cannell. Mr. Cannell ultimately discovered the error in or about July of 1997 upon reviewing Plaintiff's computer inventory records. Mr. Cannell testified that another customer requested Grade "G" steel. Therefore, he checked the computer records at Liberty Steel and discovered the steel delivered approximately one year earlier by Francosteel. Upon reviewing the records, he discovered that the tensile specification was low for Grade "G" steel. Thereafter, he "pulled the paperwork, and that's when [he] noticed that it came in . . . 'C' and not 'G'." The paperwork in Liberty Steel's office files that Mr. Cannell checked was the very same mill papers and purchase order resulting from the order placed with Francosteel one year earlier. Mr. Cannell instantly discovered the error and immediately prepared a rejection report in which he notified Francosteel of the error for the very first time.

In light of the above, the Court finds that, as a matter of law, Liberty Steel should have discovered the non-conformity well before it notified Francosteel of the breach in July of 1997. In fact, Plaintiff had three occasions in which it had ample opportunity to simply peruse the paperwork exchanged. The non-conformity involved in the present case is an obvious one—the difference between a "C" and a "G"; it is not a latent defect, nor does it require a metallurgist to detect. In fact, a cursory review by office personnel of the documentation involved would have instantly revealed that Grade "C" steel was delivered when, in fact, Grade "G" steel was ordered. Plaintiff could have taken reasonable measures to discover the difference in steel grade upon receipt of the initial confirmation, upon receipt of the

paperwork included in the shipment of steel, and finally, when it prepared the steel for delivery to its downstream customer. However, it failed to do so.

The Court understands that the outcome may be harsh, especially in light of the fact that Defendant made the initial error in entering Grade "C" steel, rather than Grade "G" steel. However, this case involves a sale of goods between merchants. Courts have consistently held that merchants are held to higher standards than consumers. See Official Comment 4 to N.Y.U.C.C. § 2–607; Oh.Rev.Code § 1302.65; see also *Eastern Air Lines v. McDonnell Douglas Corp.*, 532 F.2d 957, 976 (5th Cir.1976). In *Eastern Air Lines*, the Fifth Circuit determined that "[w]hile an ordinary purchaser is generally ignorant of his obligation to give timely notice, a merchant buyer should be well aware that some form of notice is a requirement of his trade. [The Court] finds merit, then, in those decisions which have indicated that, under section 2–607, merchants will be held to a higher standard than ordinary buyers." *Id.* (citation omitted).

Moreover, the UCC purposefully allocates responsibility among the parties to a commercial transaction. In this case, the law clearly states that the burden of providing timely notification of a breach is on the buyer. N.Y.U.C.C. § 2–607(4); Oh. Rev.Code § 1302.65(D). This is true regardless of the seller's fault. See *DiDomenico Packaging Corporation v. Nails Again, Inc.*, 139 Misc.2d 525, 527 N.Y.S.2d 676 (1988); *In re Gotham Silver Co.*, 91 F.Supp. 520 (S.D.N.Y.1950) (the purpose of the New York statute which requires the buyer after acceptance of goods to give seller notice of a breach within a reasonable time is not to inform seller of his own act, but to reveal to him that the buyer chooses to assert the act as a breach).

Therefore, in support of the policy reasons behind the UCC's section 2–607 and in accordance with the commercial standards codified therein, this Court finds that notice to Defendant approximately one year after acceptance of the non-conforming steel, and between ten and twelve months after Plaintiff ought to have known of the breach, was not given within a reasonable time. Accordingly, as only one inference can be drawn as to the timeliness of Liberty Steel's notice to Francosteel, Defendant Francosteel is entitled to summary judgment as a matter of law.[3]

### Conclusion

In light of the foregoing, there are no genuine issues of material fact which remain to be litigated, and Defendant is entitled to summary judgment as a matter of law on all counts of Plaintiff's Complaint. Accordingly, Defendant's Motion for Summary Judgment (Document # 11) is hereby GRANTED. All costs to Plaintiff.

IT IS SO ORDERED.

---

**3.** Because the Court has found that Liberty Steel's notice to Francosteel was not timely, a discussion regarding Francosteel's disclaimer of warranties and limitation of liability, as contained within the Sales Order Confirmation, is not necessary.