[Cite as *Huntington Natl. Bank v. Findlay Machine & Tool, Inc.*, 2012-Ohio-748.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

**HUNTINGTON NATIONAL BANK,**

    **PLAINTIFF-APPELLEE/**
    **CROSS-APPELLANT,**               **CASE NO. 5-11-27**

    **v.**

**FINDLAY MACHINE & TOOL, INC.,**

    **DEFENDANT-APPELLANT/**            **O P I N I O N**
    **CROSS-APPELLEE.**

**Appeal from Hancock County Common Pleas Court**
**Trial Court No. 2006 CV 460**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision: February 27, 2012**

**APPEARANCES:**

    *Ralph D. Russo*  for Appellant/Cross-Appellee

    *Thomas A. Yoder*  for Appellee/Cross-Appellant

Case No. 5-11-27

**SHAW, P.J.**

{¶1} Defendant-appellant/cross-appellee, Findlay Machine & Tool, Inc. ("FMT"), appeals the May 5, 2011 judgment of the Common Pleas Court of Hancock County, Ohio, overruling its objections to the magistrate's decision, adopting the magistrate's decision, ordering FMT to pay $63,990.00 with interest from the date of judgment to the plaintiff-appellee/cross-appellant, Automated Handling & Metalfab, Inc. ("AHM"), granting judgment in favor of AHM on FMT's counterclaim, and overruling FMT's motion for a new trial. AHM cross-appeals this same judgment, wherein the trial court overruled its motion for prejudgment interest.[1]

{¶2} The facts relevant to this appeal are as follows. AHM is a manufacturer of conveyor systems. FMT is a designer and manufacturer of cleaning systems for industrial parts. In the summer of 2005, FMT was the successful bidder to design and manufacturer three separate industrial parts cleaning systems for Caterpillar, Inc., in Joliet, Illinois, at a cost of approximately $2,000,000.00. In October of 2005, William Owsley, who was the project manager for this contract with Caterpillar, met with Jeffrey Miller, the owner of AHM, and requested that AHM submit a proposal to design and manufacture two

---

[1] On September 14, 2011, this Court granted the motion of Huntington National Bank to be substituted as the plaintiff-appellee/cross-appellant because AHM ceased to exist after the filing of this appeal and Huntington National Bank now has the right to receive payment of any amounts owed to AHM from FMT. However, for ease of discussion, we will continue to refer to the plaintiff-appellee/cross-appellant as AHM.

of the conveyor systems needed in two of these cleaning systems, the Lance washer ("the Lance") and the Rod and Housing washer ("the R&H"). AHM was not involved in any way with the third cleaning system that FMT was building for Caterpillar.

{¶3} Owsley informed Miller that FMT's original plan for the Lance washer system called for a less expensive walking beam conveyor to transport the parts through the cleaning system. However, FMT later determined a walking beam conveyor was not a feasible conveyor for the type of washer system Caterpillar needed. Consequently, FMT realized that it had underbid the Caterpillar contract and was going to lose money on the project.[2] Owsley also informed Miller that AHM would probably lose money if it built the conveyor for the Lance system but that FMT would also pay AHM to build the conveyor system for the R&H and that AHM would profit on the R&H system.

{¶4} During this initial meeting between Owsley and Miller, Owsley showed him "concept drawings" of the Lance and R&H washing systems to give him an idea of the plans FMT had for these two washing systems and the types of conveyor systems FMT wanted to use in these washers. On October 5, 2005, AHM submitted a quote for labor, material, and engineering of the two conveyor

---

[2] Catepillar was FMT's biggest customer, responsible for nearly half of all of FMT's business. Thus, although FMT stood to lose money on this particular project with Caterpillar, it was concerned with maintaining its continuous business relationship with Caterpillar.

systems, with the Lance conveyor priced at $90,000.00 and the R&H conveyor priced at $96,000.00.

{¶5} For the Lance conveyor, the quote noted that the conveyor would be designed to handle dedicated pallets 20" wide and 120" long with a conveyable flat surface on the bottom of the pallets, that the product weight including the pallets was 5,000 pounds, that pop-up stops would be utilized, that pallets would be supplied by FMT, and that the quoted cost included set up and the test run of individual pieces as necessary. For the R&H conveyor, the quote noted that caster wheels would be utilized to handle 30" wide and 80" long conveyable flat bottom pallets that had a product weight, including pallet, of 5,000 pounds, that a cylinder "dog" system would be used to move the pallets, that FMT was to verify the layout and pallet flow locations, that AHM would work with FMT engineering to verify the designs met FMT customer specifications, and that the cost included set up and the test run of individual pieces as necessary.

{¶6} A change in the height of the R&H conveyor system was later requested, resulting in an additional charge of $3,756.00. After this change, the price of the two conveyor systems totaled $189,756.00, which was to be paid in increments: 30% due with the purchase order, 30% due with integration of the conveyor into the washer system, 30% due with Caterpillar's approval at FMT's facility, and the balance due after approval by Caterpillar at its Joliet facility.

{**¶7**} On October 20, 2005, AHM sent some drawings to Owsley for his review. Over the next few months, a number of drawings of the two systems were prepared. In November of 2005, FMT approved the design of the Lance conveyor, and AHM began fabricating the Lance conveyor. Although AHM requested that pallets be provided to it by FMT in order to test the conveyor system, FMT did not provide a pallet. According to Miller, AHM tested the Lance conveyor in sections without using an FMT supplied pallet, and these sections each worked. However, the conveyor system could not be tested as one complete unit because it first had to be integrated into the Lance washer system, which was being designed and built by FMT.

{**¶8**} FMT transported this conveyor system in parts on January 6, January 13, and January 18, 2006 from AHM's facility to FMT's. This conveyor then had to be integrated into FMT's washer system by FMT. Fabricators from AHM were sent to FMT to assist in the integration of the conveyor into the washer system. During this time, FMT instructed the AHM fabricators to change the position of the three motors on the conveyor, which also required that all the guards for the sprockets be changed. In addition, the stops in the conveyor system had to be hardened because they were being damaged when hit by a pallet. There were also problems with some of the rollers because they were not level. According to Miller and Owsley, the system also needed some "debugging," which they

indicated was typical whenever one system is being integrated into another. Miller testified that the Lance conveyor was functional and all changes/repairs requested of AHM by FMT were completed by sometime in late March of 2006.

{¶9} However, according to George Hay, FMT's chief executive officer, the conveying equipment was poorly constructed. Among the problems testified to by Hay were that a number of rollers were not parallel to one another because the holes made for them in the frame were not the same elevation, causing the pallets to go askew, a number of slides, glides, and pop-up stops were in the wrong locations, and the pop-ups stops were and remain inadequate because they are scored every time a pallet hits them, causing the stops to jam.

{¶10} Meanwhile, AHM was given permission by FMT to begin the fabrication of the R&H conveyor system sometime in January of 2006. In February of 2006, Owsley approved the plans for the R&H conveyor that were submitted to him by AHM's engineer. Once again, FMT did not send any pallets to use in the testing of this system. AHM delivered this conveyor to FMT in late March of 2006.

{¶11} This system also had some problems that had to be remedied. Initially, FMT realized that the conveyor would not fit inside its washer, so AHM had to re-engineer it. Also, some of the guide rails were not aligning properly and AHM fabricators were sent to assist in fixing these problems. While integrating

the conveyor system into the washer, FMT found that some of the casters were welded flat, causing them not to be level when a pallet came to them, that some of the "dogs" would not go back sufficiently to pick up the next pallet, and that there was not a guide to prevent a pallet from falling due to its weight. Jeffrey Cable, FMT's project leader for the R&H system, testified that AHM fabricators assisted FMT employees in assembling the R&H conveyor, but that most of the necessary adjustments and repairs were made by FMT employees because FMT was under time constraints to get the R&H washer delivered to Caterpillar and because FMT did not permit AHM employees to use its major equipment.

{¶12} At different points in time, both the Lance and R&H washers were run at FMT's facility for representatives of Caterpillar. These runs were done to demonstrate to Caterpillar that the washer systems were capable of satisfactorily cleaning out various particles found in Caterpillar's parts. After the successful run of the Lance system, it was sent to Caterpillar's facility in Joliet in August of 2006. Once the R&H system was successfully run for Caterpillar's representatives, it was also sent to Caterpillar's Joliet facility in October of 2006. However, both washer systems experienced operating difficulties after arriving at Caterpillar, and FMT employees have made a number of trips to Joliet to attempt to resolve the problems. The testimony from FMT's employees was that the

operating difficulties stemmed from problems with each system's conveyors, which were not operating properly.

**{¶13}** FMT made a number of payments to AHM, totaling $113,766.00, between October 11, 2005 and May 3, 2006. However, FMT did not pay the remaining amount owed of $75,990.00. When Miller contacted FMT about the unpaid amount, he spoke with Andrew Rill, FMT's controller. Rill informed Miller that FMT had not paid the remaining balance to AHM because Caterpillar had not yet paid its balance on its contract with FMT. Rill did not inform Miller of any remaining problems with the conveyor systems nor did anyone at FMT express any dissatisfaction with the conveyor systems to Miller. FMT never paid AHM the remaining balance on the contract. In addition, Caterpillar did not approve the Lance and R&H washer systems.

**{¶14}** On July 28, 2006, AHM filed a complaint for breach of contract against FMT. FMT filed its answer to this complaint on October 1, 2006, and also filed a counterclaim for breach of contract. FMT filed a supplemental counterclaim for breach of contract on April 25, 2007. The matter proceeded to a bench trial before a magistrate on September 5 and 7, 2007.

**{¶15}** On February 29, 2008, the magistrate issued her decision, finding that FMT had breached its contract with AHM and that AHM had established that it was owed $63,990.00 on this contract ($75,990.00 less $3,000.00 from the

change order on the R&H system and less $9,000.00 due upon approval from Caterpillar). The magistrate also found that FMT failed to establish that AHM violated the terms of the contract based on the delivery dates, had failed to establish that AHM violated any express or implied warranties, had conducted itself in relation to the conveyor systems in a manner that demonstrated it had accepted the conveyors, and had failed to establish the basis for any damages. Based on these findings, the magistrate recommended that the trial court grant judgment in favor of AHM and award damages in the amount of $63,990.00 with interest at the legal rate of 8% from the date of judgment and that judgment on the counterclaim be granted in favor of AHM.

{¶16} FMT filed objections to the magistrate's decision on March 14, 2008. After the transcript was filed, FMT filed supplemental and revised objections on June 30, 2008, listing eight specific issues with the magistrate's decision. AHM filed its response to FMT's objections and a motion for pre-judgment interest on July 17, 2008. On July 9, 2009, FMT filed a motion for a new trial on the issue of FMT's damages, asserting that Caterpillar had now unequivocally rejected the Lance and R&H washers, refused to pay the balance of its contract with FMT, and would no longer discuss the matter with FMT.

{¶17} On May 5, 2011, the trial court overruled all of FMT's objections, adopted the magistrate's decision, granted judgment in favor of AHM on its claim

Case No. 5-11-27

and awarded it $63,990.00 with interest at the legal rate from the date of judgment, granted judgment in favor of AHM on FMT's counterclaim, and overruled FMT's motion for a new trial.

{¶18} This appeal followed, and FMT now asserts seven assignments of error for our review.

### FMT'S ASSIGNMENT OF ERROR I

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY OVERRULING FMT'S OBJECTIONS TO THE MAGISTRATE'S DECISION, ADOPTING THE MAGISTRATE'S DECISION AND ENTERING FINAL JUDGMENT AGAINST FMT WITHOUT UNDERTAKING AN INDEPENDENT REVIEW AS TO THE OBJECTED MATTERS TO ASCERTAIN THAT THE MAGISTRATE PROPERLY DETERMINED THE FACTUAL ISSUES AND APPROPRIATELY APPLIED THE LAW.**

### FMT'S ASSIGNMENT OF ERROR II

**THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO FMT BY OVERRULING FMT'S OBJECTIONS B, C, AND F AND THEREBY ADOPTING THE FINDING OF THE MAGISTRATE THAT "FMT FAILED TO ESTABLISH THAT AHM VIOLATED EXPRESS OR IMPLIED WARRANTIES."**

### FMT'S ASSIGNMENT OF ERROR III

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN OVERRULING FMT'S OBJECTION A THEREBY ADOPTING THE MAGISTRATE'S DECISION THAT AHM, DESPITE HAVING A DUTY TO TEST THE CONVEYOR SYSTEMS, WAS NOT PROVIDED NOTICE OF DEFECTS IN THE TWO CONVEYOR SYSTEMS WHICH PRECLUDED FMT FROM ITS REMEDIES OF BREACH OF WARRANTY.**

## FMT'S ASSIGNMENT OF ERROR IV

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY OVERRULING FMT'S OBJECTIONS D AND G AND CONSEQUENTLY ADOPTING THE MAGISTRATE'S DECISION THAT FMT'S ACCEPTANCE OF THE DELIVERY OF THE TWO CONVEYOR SYSTEMS AND FMT'S APPROVAL OF AHM'S DESIGN OF THE PLANS LEAVES FMT WITH NO LEGAL RECOURSE AGAINST AHM'S CLAIM FOR PAYMENT.**

## FMT'S ASSIGNMENT OF ERROR V

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY OVERRULING FMT'S OBJECTION H IN ITS ENTIRETY AND CONSEQUENTLY ADOPTING THE MAGISTRATE'S DECISION THAT FMT FAILED TO ESTABLISH ANY BASIS FOR ANY DAMAGES EITHER ON ITS COUNTERCLAIM OR AS A SET-OFF AGAINST THE JUDGMENT AWARDED TO AHM.**

## FMT'S ASSIGNMENT OF ERROR VI

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND ABUSED ITS DISCRETION BY OVERRULING FMT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.**

## FMT'S ASSIGNMENT OF ERROR VII

**THE TRIAL COURT'S JUDGMENT ADOPTING THE MAGISTRATE'S DECISION IS CONTRARY TO LAW AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND JUDGMENT SHOULD HAVE BEEN ENTERED IN FAVOR OF FMT DISMISSING AHM'S COMPLAINT AND GRANTING FMT JUDGMENT ON ITS COUNTERCLAIM.**

{¶19} In addition, FMT filed a cross-appeal and now asserts one assignment of error for our review.

**AHM'S CROSS-ASSIGNMENT OF ERROR**

**THE TRIAL COURT COMMITTED ERROR IN NOT GRANTING THE FORMER APPELLEE PRE-JUDGMENT INTEREST PURSUANT TO OHIO REVISED CODE 1343.03 IN A BREACH OF CONTRACT CASE. THE COURT FOUND THAT THE DISPUTE INVOLVED A CONTRACT DISPUTE BETWEEN THE PARTIES AND FOUND LIABILITY ON THE PART OF THE APPELLANT TO THE FORMER APPELLEE IN THE AMOUNT OF $63,990 FOR BREACH OF THAT CONTRACT, BUT FAILED TO AWARD PREJUDGMENT INTEREST ON THAT AMOUNT FROM APRIL OF 2006 WHICH WAS THE TIME OF THE BREACH. AS SET FORTH HEREIN, OHIO REVISED CODE 1343.03 BESTOWS THE RIGHT OF AUTOMATIC PRE-JUDGMENT IN A BREACH OF CONTRACT CASE.**

*First Assignment of Error of FMT*

**{¶20}** In its first assignment of error, FMT asserts that the trial court erred by overruling its objections to the magistrate's decision because the judgment entry does not contain any supporting evidence that the trial court conducted an independent review of the magistrate's decision. More specifically, FMT contends that although the trial court's entry states that it conducted an independent review of the magistrate's decision, the entry does not reflect in any other manner that the trial court conducted an independent review, i.e. the entry does not mention what evidence or exhibits it relied upon, does not refer to specific transcript pages or particular witnesses, and does not cite any case law or the Revised Code chapter that addresses the substantive merits of the case. FMT

further requests that this Court conduct a de novo review of the magistrate's decision and objections.

**{¶21}** Pursuant to Rule 53(D)(4)(d) of the Ohio Rules of Civil Procedure, when objections are filed to a magistrate's decision, the trial court must independently review the objected matters to decide if the magistrate properly determined the factual issues and appropriately applied the law. *Brandon v. Brandon*, 3d Dist. No. 10-08-13, 2009-Ohio-3818, ¶ 31; *Davidson v. Davidson*, 7th Dist. No. 07 BE 19, 2007-Ohio-6919, ¶ 9. Accordingly, the trial court is free to adopt, reject, or modify the decision of the magistrate under its de novo review. *Goldfuss v. Traxler,* 3d Dist. No. 16-08-12, 2008-Ohio-6186, ¶ 7, citing *Stumpff v. Harris*, 2d Dist. No. 21407, 2006-Ohio-4796, ¶ 16; Civ.R. 53(D)(4)(b).

**{¶22}** When examining whether a trial court has conducted the required independent review of a magistrate's decision, appellate courts "generally presume regularity in the proceedings below, and, therefore, we generally presume that the trial court conducted its independent analysis in reviewing the magistrate's decision." *Mahlerwein v. Mahlerwein*, 160 Ohio App.3d 564, 2005-Ohio-1835, 828 N.E.2d 153, ¶ 47 (4th Dist.). Therefore, the party who asserts that the trial court did not conduct such a review bears the burden of affirmatively demonstrating the trial court's failure to perform its duty. *Id.*; *Figel v. Figel*, 3d Dist. No. 10-08-14, 2009-Ohio-1659, ¶ 10.

{¶23} Furthermore, a trial court's decision will not be reversed on appeal as being against the manifest weight of the evidence as long as there is some competent, credible evidence to support the decision. *Cichanowicz v. Cichanowicz*, 3d Dist. No. 3-08-04, 2008-Ohio-4779, ¶ 20, citing *Duer v. Moonshower*, 3d Dist. No. 15-03-15, 2004-Ohio-4025, ¶ 15.

{¶24} In its entry, the trial court quoted the exact language of Civ.R. 53(D)(4)(d) in regards to ruling on objections to a magistrate's decision. The court also noted that it could adopt, reject, or modify the magistrate's decision, in whole or in part, because it was to conduct a de novo review of any determination of fact or law made by the magistrate as it had the ultimate authority and responsibility over the magistrate's findings and rulings. The trial court further noted that it was responsible for substituting its judgment for that of the magistrate's whenever the magistrate improperly determined the factual issues and/or inappropriately applied the law.

{¶25} Additionally, the trial court's entry detailed who testified, their respective roles in the matter, and the number of exhibits submitted by both parties. The court then stated that it reviewed the objections, the magistrate's decision, and the transcript filed in this case, including that it reviewed the testimony of each witness (each of which the court named) and the exhibits that were admitted into evidence.

{¶26} After detailing what it had considered, the trial court stated that upon its independent review it found that the magistrate properly determined the factual issues and appropriately applied the law. Thus, the trial court elected to adopt the magistrate's decision in toto and overruled the objections filed by FMT.

{¶27} While the trial court's judgment entry did not specifically quote witnesses or otherwise cite to the substantive law upon which it relied, there is nothing in the record to indicate that the trial court did not independently review the objected matters. Furthermore, FMT has failed to affirmatively demonstrate that the trial court did not perform its duty to conduct an independent review. Accordingly, FMT's first assignment of error is overruled.

*FMT's Second, Third, Fourth,*
*and Seventh Assignments of Error*

{¶28} FMT's second, third, fourth, and seventh assignments of error each involve issues regarding the trial court's findings as to which party breached the contract and whether AHM breached any warranties it made, expressly or impliedly, about the conveyor systems. More specifically, FMT maintains in its second assignment of error that the trial court incorrectly found that AHM did not breach any express warranties, that AHM did not breach the implied warranty of fitness for a particular purpose, and that AHM did not breach the implied warranty of merchantability. In its third assignment of error, FMT asserts that the trial court incorrectly found that FMT was precluded from a remedy for a breach of any

types of warranties by AHM because FMT failed to provide notice to AHM of defects in the two conveyor systems. FMT contends in its fourth assignment of error that the trial court incorrectly found that FMT had no legal recourse against AHM's claim for payment because it accepted delivery of the conveyor systems and approved the design plans submitted by AHM. Lastly, in FMT's seventh assignment of error it maintains that the trial court's judgment was against the manifest weight of the evidence. In support of this assignment of error, FMT relies upon the assertions outlined in its second, third, and fourth assignments of error. Once again, FMT urges this Court to conduct its own review of the evidence and rule accordingly.

{¶29} Contrary to FMT's request that this Court conduct a de novo review of the evidence, an appellate court is not permitted to reverse a trial court's judgment when it is supported by competent, credible evidence going to all of the essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). "Under this highly deferential standard of review, a reviewing court does not decide whether it would have come to the same conclusion as the trial court. Rather, we are required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate factual conclusions." *Hooten Equip. Co. v. Trimat, Inc.*, 4th Dist. No. 03CA16, 2004-Ohio-1128, ¶ 7. We are to defer to the

findings of the trier of fact because in a bench trial, the trial judge "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and to use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, a trial court's decision involving R.C. 1302.01 et seq., that is based on competent, credible evidence, will not be reversed on appeal. *George v. Fannin*, 67 Ohio App.3d 703, 709, 588 N.E.2d 195 (12th Dist. 1990), citing *Konicki v. Salvaco, Inc.*, 16 Ohio App.3d 40, 42, 474 N.E.2d 347 (2d Dist. 1984).

{¶30} Initially, we note that the parties do not dispute that the merits of this case are governed by R.C. 1302.01 et seq., Ohio's codification of the U.C.C. for the sale of goods. Ohio's adoption of the U.C.C. provides multiple remedies for buyers of alleged nonconforming goods, including the purchase and installation of custom-made goods. *Varavvas v. Mullet Cabinets, Inc.*, 185 Ohio App.3d 321, 2009-Ohio-6962, 923 N.E.2d 1221, ¶ 45. Further, the parties do not dispute that the trial court correctly found that $63,990.00 was the remaining purchase price on the contract and that FMT had not paid this amount. Rather, these assignments of error center around two questions: (1) whether AHM failed to design and fabricate two conveyor systems that performed as required, which would entitle FMT to damages and if not, (2) whether FMT is precluded from recovering any damages and must pay the remaining purchase price because it accepted and/or did

not effectively revoke its acceptance of the conveyors *and* did not notify AHM of the breach within a reasonable time after discovering the breach. We find the second question to be dispositive of these assignments of error.

{¶31} FMT does not dispute that it accepted the conveyors at issue. However, FMT maintains that its acceptance of the conveyors does not preclude it from recovering damages for any breach of express or implied warranties by AHM. The Revised Code establishes the remedies available to a buyer, such as FMT, after the goods have been accepted and the time for revocation of acceptance has passed. The relevant section of the Revised Code states: "Where the buyer has accepted goods *and given notification as provided in division (C) of section 1302.65 of the Revised Code*, he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." (Emphasis added.) R.C. 1302.88(A).

{¶32} A buyer's failure to notify the seller of the non-conformity in accordance with R.C. 1302.65(C) operates to bar the buyer's remedies under the statute. Revised Code section 1302.65(C), in relevant part, states: "Where a tender has been accepted: (1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; * * *." The Ohio Supreme Court has stressed that "the

'determination of a reasonable time and the adequacy of notice to the seller are ordinarily questions of fact.'" *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 537 N.E.2d 624 (1989), qutoing *Kabco Equip. Specialists v. Budgetel, Inc.*, 2 Ohio App.3d 58, 61, 440 N.E.2d 611 (10th Dist. 1981); *Allen Food Products, Inc. v. Block Bros., Inc.*. 507 F.Supp. 392, 394 (S.D.Ohio 1980); *Agway, Inc. v. Teitscheid*, 144 Vt. 76, 80, 472 A.2d 1250, 1253 (1984).

{¶33} In determining what constitutes adequate notice, the Ohio Supreme Court has stated the following:

> **R.C. 1302.65 is a codification of UCC 2-607. Official Comment 4 to UCC 2-607 provides: "The content of the notification need merely be sufficient to let the seller know that the transaction is troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2-605 [R.C. 1302.63] ). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy.** *The notification which saves the buyer's rights under this Article [R.C. Chapter 1302] need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.***"**
>
> **While the Official Comments to UCC 2-607 supply courts with interpretative assistance, we have recently noted that "[t]he Official Comment following R.C. 1302.65 [UCC 2-607] provides somewhat contradictory guidance as to how the notice requirement is to be construed."** *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.* **(1989), 42 Ohio St. 3d 40, 52, 537**

**N.E.2d 624, 636. The debate as to whether a strict or liberal approach should be applied to UCC 2-607 persists. \* \* \***

**This issue, however, has been decided by *Chemtrol*, supra, wherein we stated: "We reject the strict reading of R.C. 1302.65(C)(1) [and UCC 2-607] \* \* \* as we believe that notice may be sufficient under the statute despite the fact that the notice does not specifically allege a breach of the contract. Moreover, in our view, the statute was not meant to exclude the possibility that notice may be inferred. \* \* \* Therefore, no specific form or words are required in the notice of breach of contract under R.C. 1302.65(C)(1).**

(Emphasis added.) *AFG, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 179-180, 555 N.E.2d 634 (1990).

{¶34} FMT maintains that the trial court erred in finding that FMT did not provide notice of the defects in the conveyor systems within a reasonable time. Rather, it asserts that when it notified AHM of the various problems with both conveyor systems, that this was sufficient notice of the breach to let AHM know that the transaction was troublesome and must be watched. FMT also asserts that AHM failed to test the conveyors as required, and if it had done this testing, it would have had notice that its conveyor systems were defective.

{¶35} We agree with FMT that the evidence before the trial court revealed that AHM was on notice that the transaction was troublesome when FMT initially informed AHM of a number of problems with both conveyor systems. However, the evidence before the trial court also showed that each problem that was brought to AHM's attention by FMT was remedied. In fact, Miller testified that after April

-20-

2006, he believed that AHM had taken care of every issue that FMT had with the conveyors and that he believed that AHM had gone above and beyond what was required of it to assist FMT in making its washer systems operational. He further testified that after April of 2006, he was not informed of any more problems with the conveyor systems and was told in May of 2006 that the reason his company had not been paid the remaining balance on the contract was because FMT was waiting to be paid by Caterpillar. He was never told that FMT was withholding payment because of any problems with the conveyor system.

{¶36} As previously noted, the reason that the notification which saves the buyer's rights under R.C. Chapter 1302 need only be such as to inform the seller that the transaction is claimed to involve a breach is so that the way for normal settlement through negotiation is opened. Here, FMT notified AHM that the conveyor systems had a number of problems. FMT then worked with AHM to remedy these problems. By April of 2006, AHM believed that all the problems had been remedied and that FMT was now satisfied with the conveyor systems. Indeed, the project manager through April of 2006 for FMT, William Owsley, who is the one who worked directly with AHM, testified that he was satisfied with AHM's work and cooperation in troubleshooting during the integration process. Thus, AHM was not given notice that its transaction with FMT remained problematic.

{¶37} Moreover, the evidence before the trial court revealed that FMT chose to no longer communicate with AHM about the problems with the conveyors. In fact, when Miller contacted FMT in May about the remaining balance due, he was not told of any dissatisfaction with the conveyors but was simply told that FMT was waiting on payment from Caterpillar. Additionally, FMT sent the washer systems, including the conveyors made by AHM, to Joliet, and took it upon itself to make numerous changes to the conveyors without involving AHM or even informing AHM that problems remained. The trial court found that these actions demonstrated FMT's acceptance and ownership of the conveyors, served to prevent AHM from being notified that problems persisted, and that FMT made the decision to use these conveyors and to perform work on the conveyors itself due to its own time constraints in its contract with Caterpillar.

{¶38} As to FMT's claims that AHM failed to test the conveyors as required and that it would have been put on notice of the problems with the conveyors if it had tested them, the contract for the conveyors stated, "[c]ost includes set up and test run *individual pieces as* [*n*]ecessary." Contrary to FMT's position, this language does not demonstrate that AHM had an affirmative duty to test run the conveyor systems once completely integrated into the washer systems, only that it would test the individual pieces of the conveyor systems as necessary. Miller testified that the Lance system was tested in parts by AHM at its facility

prior to being delivered to FMT but that no pallets were supplied to AHM for either the Lance or R&H systems. The trial court found this testimony to be credible. In addition, the trial court found, and the evidence supported that neither conveyor could be fully tested, i.e. with a number of pallets weighing up to 5,000 lbs. in a continuous cycle through the washing stages, until they were integrated into their respective washer systems. The contract did not require this type of testing on the part of AHM. Therefore, FMT continued to have a duty to notify AHM if it continued to experience problems with the conveyors, particularly after AHM was led to believe by FMT that any problems with the conveyors had been remedied.

{¶39} In short, the trial court found that FMT failed to provide a timely and *adequate* notice of continuing problems with the conveyor systems. In fact, the trial court also noted that FMT stopped calculating interest due from AHM for delaying the project in July of 2006 because it acknowledged that the conveyors were at "functional capacity." These findings are supported by some, competent credible evidence, and they support the trial court's determination that FMT, by its own decisions and actions, failed to properly notify AHM of the non-conforming nature of the conveyors or to otherwise act in compliance with R.C. Chapter 1302. Accordingly, the trial court did not err in finding that FMT breached its contract with AHM, that FMT was responsible for the remaining balance on the contract

-23-

(less the amounts deducted without objection by AHM), and that FMT was not entitled to damages and/or an off-set of the balance for breach of contract by AHM.

{¶40} For all of these reasons, FMT's second, third, fourth, and seventh assignments of error are each overruled.

*FMT's Fifth and Sixth Assignments of Error*

{¶41} Both FMT's fifth and sixth assignments of error involve issues relating to the damages it sustained based on AHM's breach of contract. Given our decision as to FMT's second, third, fourth, and seventh assignments of error that the trial court did not err in finding in favor of AHM and against FMT, the fifth and sixth assignments of error of FMT are moot, and, accordingly, both are overruled.

*AHM's Assignment of Error*

{¶42} In its sole assignment of error, AHM asserts that the trial court erred in overruling its motion for pre-judgment interest that it filed on July 17, 2008. AHM maintains that R.C. 1343.03(A) entitles it to prejudgment interest as a matter of law. In response, FMT contends that the trial court correctly overruled AHM's motion for pre-judgment interest because AHM failed to file an objection to the magistrate's decision, which did not award pre-judgment interest to AHM.

{¶43} The award of pre-judgment interest as to claims arising out of breach

of contract is governed by R.C. 1343.03(A). *Dwyer Elec., Inc. v. Confederated Builders, Inc.*, 3d Dist. No. 3-98-18 (1998). In pertinent part, this section provides that: " * * * [w]hen money becomes *due and payable* upon any bond, bill, note, *or other instrument of writing,* * * * for the payment of money arising out of * * * a contract or other transaction, the creditor is entitled to interest * * *." (Emphasis added.) R.C. 1343.03(A).

{¶44} "The language of R.C. 1343.03(A) is neither permissive nor ambiguous. In a breach of contract case between private parties where liability is established, the trial court does not have discretion in awarding prejudgment interest." *Butterfield v. Moyer*, 3d Dist. No. 8-04-04, 2004-Ohio-5891, ¶ 14. "Specifically, in cases like this one where a party has been granted judgment on an underlying contract claim, that party is entitled to prejudgment interest as a matter of law." *W & W Roofing & Siding, Inc. v. H.P. Group, L.L.C.,* 3d Dist. No. 5-01-11, 2001-Ohio-2248, citing *Dwyer Elec.,* supra.

{¶45} The Supreme Court of Ohio has held that "in determining whether to award prejudgment interest pursuant to R.C. 1343.03(A), ' * * *, a court need only ask one question: Has the aggrieved party been fully compensated?'" *Dwyer Elec.,* supra; quoting *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 116, 652 N.E.2d 687 (1995). In order to be fully compensated, or made whole, an aggrieved party should be compensated for the lapse of time between

accrual of the claim and judgment. *Id*. at 117. This is the role and purpose of pre-judgment interest. Accordingly, the only issue for resolution by a trial court in claims made pursuant to R.C 1343.03(A) is how much interest is due the aggrieved party. *Id*. In order to determine this, the trial court must make a factual determination as to *"when* interest commences to run, *i.e.,* when the claim becomes 'due and payable,' and to determine *what* legal rate of interest should be applied." (Emphasis in original.) *Id*. at 115. Thus, while the right to pre-judgment interest in a contract claim is a matter of law, the amount awarded is based on the court's *factual determination* of an accrual date and interest rate.

{¶46} In the case sub judice, AHM's claim for pre-judgment interest was based upon a contract. Thus, the trial court was required to award pre-judgment interest. The only question for the trial court was what date the pre-judgment interest began to accrue. Nevertheless, the trial court found that AHM failed to object to the magistrate's decision, which did not include an award of pre-judgment interest. Thus, the trial court overruled AHM's motion for pre-judgment interest.

{¶47} Civil Rule 53(D)(3)(b)(iv) provides that if a party fails to file a timely objection to the magistrate's decision, "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or

conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)."

{¶48} The Ohio Supreme Court has discussed the application of the plain error doctrine in civil cases, finding that, "[i]n appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, syllabus, 679 N.E.2d 1099 (1997).

{¶49} "A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings." *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209, 436 N.E.2d 1001. While conceding that pre-judgment interest in this case was mandatory, FMT maintains that the failure of the trial court to award pre-judgment interest because AHM did not file an to the magistrate's decision on this issue does not rise to the level of plain error.

{¶50} However, the Rules of Civil Procedure specifically state that in the absence of an objection, a trial court may adopt a magistrate's decision "unless it determines that there is an error of law or other defect on [its] face." Civ.R

Case No. 5-11-27

53(E)(4)(a).  Review under the plain error standard is limited on appeal to review of "the trial court's adoption for failure to correct an obvious error of law or other such defect in the decision."  *Timbercreek Village Apts. v. Myles*, 2d Dist. No. 17422 (1999), citing *Divens v. Divens*, 2d Dist. No. 97 CA 0112. (1998).

{¶51} Although AHM filed a motion for pre-judgment interest, thereby bringing the issue to the trial court's attention, the trial court adopted the magistrate's decision and overruled AHM's motion.  The magistrate's decision and recommendations clearly omitted an award of pre-judgment interest, a defect that was obvious on its face.  Pursuant to *Royal Elec.,* supra, and the plain language of  R.C. 1343.03(A), AHM has not been fully compensated and is entitled to prejudgment interest.  Thus, AHM's assignment of error is sustained, and we remand the matter to the trial court to determine the amount of pre-judgment interest owed, i.e. to determine the "due and payable" date and the legal rate of interest.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**